Roy V. Hoffman v. County Commissioners of Pawnee County et al.

1. MUNICIPAL CORPORATION—*Implied Power—Indebtedness*. A municipal corporation has the implied power to incur indebtedness whenever it is necessary so to do so to carry out any power conferred upon it, unless the contracting of such indebtedness is prohibited by statute.

2. PAWNEE COUNTY—*Certain Laws in Force. Eo Instante* upon the completion of the organization of Pawnee county and the opening of the Cherokee outlet, the Pawnee and Tonkawa Indian reservations to settlement in pursuance of the act of .congress of March 3, 1893, and the president's proclamation thereunder, the Organic Act and the constitution and all laws of the United States not locally inapplicable or in conflict with said Organic Act and all laws of the Territory of Oklahoma went into effect.

3. AMBIGUOUS LAWS—*Contemporaneous Construction*. In the construction of a doubtful and ambiguous law the ·contemporaneous construction of those who are called upon to act under the law and were appointed to carry its provisions into effect, is entitled to very great respect. (*Edwards v. Darvey*, 12 Wheat. 210.)

4. COUNTIES — *Indebtedness — Limitation—Statute*. Section 4 of the act of congress of July 30, 1886, provides that no political or municipal corporation, or other subdivision in any of the territories of the United States shall ever become indebted in any manner or for any purpose to any amount in the aggregate,. including existing indebtedness, exceeding four per centum on the value of the taxable property within such· corporation, county or subdivision, to be ascertained by

the last assessment for territorial and county taxes previous to the incurring of such indebtedness, *held*, that said act has been modified as to its effect in Pawnee county prior to the first assessment for territorial and county taxes by various acts of congress, so that said county may contract a debt not exceeding four per centum of the taxable property therein, to be ascertained by the first assessment.

5. SAME — *Validity of Indebtedness*. The indebtedness created in Pawnee county within the provisions of law not in excess of four per cent. of the value of the taxable property therein for county and territorial taxes, and prior to the first assessment, is a valid and binding obligation against said county, and all bonds or obligations in excess of any such amount are void.

*Error from the District Court of Pawnee County.*

### STATEMENT OF THE CASE.

On the 16th day of November, 1894, the county commissioners and county clerk of Pawnee county appeared before the district court of said county, pursuant to published notice as required by law, and filed a petition to issue funding bonds of said county. In said petition it was represented that the amount of outstanding indebtedness due and unpaid aggregated the sum of $20,178.68, and that the assessed valuation of the taxable property of said county at said date reached the sum of $222,318. At the hearing, John F. Stone, W. M. Allison, A. J. Biddison and C. J. Wrightsman, on behalf of certain tax payers and warrant holders, each showing his interest in the matter, duly protested against the funding of certain warrants of said county, as will hereafter appear.

The following evidence was introduced on the hearing, omitting exhibits:

W. W. White, being duly sworn, testified as follows:

"Ques. By the Court: You are the chairman of the Board of County Commissioners? Ans. Yes, sir.

"Q. Have you examined this statement of the warrants of Q county? A. Yes, sir.

"Q. I believe it is divided into Exhibits 'A' and 'B,' Exhibit 'A' covering the warrants issued from January 1, to July 10, 1894, and Exhibit 'B' the warrants from July 11, up to this time. A. I haven't examined that yet.

"Q. How much indebtedness does that list? A. The entire indebtedness of the county, $20,178.68 for what warrants have been issued.

"Q. What are the denominations of these funding bonds you have had printed? A. $500.

"Q. In the amount up to $8,892.72 are there any warrants that are issued for any other purpose than for the payment of rent, fuel, lights, stationery, books, furniture, salaries of officers, traveling expenses, where allowed by law to officers, clerk hire, expenses of the courts chargeable to the county, keeping and guarding prisoners, transporting same, repairs, and all matters whatsoever pertaining to the necessary and actual operating expenses of the county, and in addition thereto, the expenses of purchasing necessary cells and cages for the confinement of prisoners, not to exceed $3,000 to any one county? A. There is one thing there that seems to me to require a decision of the court to decide—what are the necessary expenses of the government?

"Q. What are these warrants for? A. There are some there that I should pronounce illegal, that were issued for road work, and bridge warrants.

The Court: "Road and bridge warrants will be disallowed. I think there is no question about them; they are not authorized."

Frank S. Dimon, being duly sworn, testified as follows:

"I will say there are some warrants marked here as 'supplies.' Those supplies, some of them, were for furnishing the bridge work and matters of that kind."

The Court: "Call the list of warrants up to about

$8,500, and if there are any matters of that kind, call the court's attention to them.''

Mr. Stone: ''Before proceeding further, I wish now, on behalf of the holders of the warrants issued on and since July 11, 1894, to protest against the bonding of any and all warrants of Pawnee county issued prior to July 11, 1894, for the reason that they were all issued in excess of the limitation of county indebtedness in territories of the United States, as fixed by act of congress approved July 30, 1886, there being no assessment for territorial and county purposes in said Pawnee county until July 11, 1894.''

Objection overruled, and exception.

Mr. Stone: ''I wish further to object to all warrants issued for sheriff's fees, except those issued to Frank S. Dimon and M. F. Lake, for the reason that no sheriff's fees can be allowed to anyone under the statute, except the sheriff himself, and these warrants issued to deputy sheriffs are illegal.''

Objection overruled, and exception.

Mr. Biddison: ''I wish to object to the bonding of all road and bridge warrants, all warrants for surveying, and the warrants issued for digging a well on the public square.''

Objection sustained.

Mr. Houston: ''I object to the salary warrants issued, for the reason that the salaries were allowed upon an illegal population of 12,000, when we had only 6,000 or 7,000.''

By the Court: ''The salary warrants for the first quarter have been paid. I will allow the next two quarters' salary to be bonded, and will exclude the next warrant, and that will reduce the salaries to the proper limit, there being no objection.''

Mr. Stone: ''I object to all, as heretofore, on the ground only that the limit has been exceeded.''

By the Court: ''That objection will be overruled.'' Exception. .

Mr. ————: ''I object to the funding of the war-

rants issued for jail cells, as being constructed and issued without authority."

Objection sustained. Exception.

Mr. Wrightsman: "I object to the funding of warrants issued to pay expenses of certain inquests, the deaths having occurred in Payne county."

Objection sustained.

Mr. Biddison: "I object to the funding of warrants issued to certain persons for attending *habeas corpus* hearing at Guthrie, they having voluntarily attended."

Objection sustained.

By the Court: "Gentlemen, the rulings made cover all classes of warrants in this list. You will now foot up the amount, principal and interest, of those not excluded, which amount cannot exceed 4 per cent of the assessed valuation of the county, as shown by the assessment."

Mr. Stone: "Will it not of necessity exceed the 4 per cent. limit for the reason that the limit was reached six months ago, and the interest on valid warrants is valid, even if it is in excess of the limit, and the amount will then be the 4 per cent limit with six months interest added, or about $9,100."

By the Court: "The court holds that the limit is arbitrary, and bonds will be signed for 4 per cent. only." Exception.

On the same date the court ordered the following journal entry of record :

"Territory of Oklahoma, Pawnee County, ss.—In the District Court:

" *In Re the Application of the County Commissioners and County Clerk of Pawnee County to Issue Funding Bonds.*

JOURNAL ENTRY.

"Be it remembered, that now, to-wit: on this 16th day of November, A. D. 1894, personally appeared in open court, W. W. White, A, G. McCain and M. West-

brook, county commissioners, and Frank S. Dimon, county clerk of Pawnee county, in Oklahoma Territory, and file their petition to have the court pass upon and determine the amount of the legal outstanding warrants of said Pawnee county and to sign bonds of said county for the funding of said warrants, which said application is as follows, to-wit :

"Territory of Oklahoma, Pawnee County, ss.—In the District Court.

"*Application to Issue County Funding Bonds.*

"Now come W. W. White, A. G. McCain and M. Westbrook, county commissioners of Pawnee county, Oklahoma Territory, and Frank S. Dimon, county clerk of said county, and respectfully petition the judge of the district court of the Fourth judicial district in and for Pawnee county, Oklahoma Territory, to examine into and determine the correct amount of the legal outstanding warrants of said Pawnee county and to sign bonds of said Pawnee county for the funding and payment of said outstanding warrants of said county, as required by law.

"Your petitioners, as county commissioners and county clerk, have caused the amount of the outstanding warrants of said county issued since the organization of said Pawnee, formerly Q county, and up to the date of this application, to be determined and find the amount now outstanding, due and unpaid, to aggregate the sum of twenty thousand, one hundred, seventy-eight dollars and sixty-eight cents, a list of which warrants is hereto attached, marked Exhibits 'A' and 'B' and made a part hereof.

"Your petitioners further represent that the assessed valuation of the taxable property of said Pawnee county at this date aggregate the sum of two hundred twenty-two thousand three hundred and eighteen dollars.    "W. W. WHITE, Chairman.
                 "M. WESTBROOK,
                 "A. G. McCAIN, Commissioner. s
                 "FRANK S. DIMON; Co. Clerk."

"At the same time and accompanying said application said applicants file the following proof of publi-

cation of notice of said application, which said notice and proof of publication are as follows, to-wit:

"NOTICE OF APPLICATION TO ISSUE COUNTY FUNDING BONDS.

"Notice is hereby given that on the 16th day of November, A. D., 1894, the undersigned county commissioners and county clerk of Pawnee (Q) county, in Oklahoma Territory, will appear in the district court of said Pawnee (Q) county, and in open court ask the judge of said court to hear and determine their application to issue county funding bonds of said county for the funding of said debt, at which time any person interested may appear and protest against the funding of any of the outstanding warrants of said county.

"The county commissioners upon examination have found the correct amount of claims allowed against the county and for which warrants have issued, which are outstanding, due and unpaid to be the sum of $20,-173.68.   "W. W. WHITE, Chairman.
    "M. WESTBROOK.
    "A. G. McLAIN, Commissioners,
"(SEAL.)    "FRANK S. DIMON, Co. Clerk.
"Dated, Pawnee, Oklahoma, November 8, 1894.

PROOF OF PUBLICATION.

"Territory of Oklahoma, County of Pawnee,

"*Notice of Application to Issue County Funding Bonds.*

AFFIDAVIT OF PRINTER.

"A. F. Stennett, being duly sworn, says, that he is the foreman of the Times-Democrat, a newspaper printed in and of general circulation in Pawnee county, in the Territory of Oklahoma; and that the notice, of which the attached is a true copy, was published for seven consecutive days in said newspaper, commencing on the 9th day of November, 1894.
                     "A. F. STENNETT.
"Subscribed and sworn to before me this 16th day of November, A. D. 1894.
"(SEAL.)                     FRANK S. DIMON,
        "County Clerk Pawnee (Q) County, O. T.

Hoffman v. County Commissioners.

"Thereupon said applicants file the affidavit of Frank S. Dimon, county clerk of said Pawnee county, in support of said application, which said affidavit is in matter and form as follows, to-wit:

"Territory of Oklahoma, Pawnee County, ss.

"Personally appeared Frank S. Dimon, who, being first duly sworn, upon his oath, says, that he is the county clerk of Pawnee county, Oklahoma Territory, and that the lists of outstanding county warrants filed as a part of the application to bond in this case are true and correct lists of the warrants of said Pawnee county, Oklahoma Territory, now outstanding, due and unpaid, as shown by the records of his office.

"And that the assessed valuation of the taxable property of said Pawnee county, Oklahoma Territory, as shown by the records of his office, is the sum of two hundred and twenty-two thousand three hundred and eighteen ($222,318) dollars.

"FRANK S. DIMON, County Clerk.

"Subscribed and sworn to before me this 16th day of November, 1894.

"(SEAL.)                    LEWIS E. CRAIG,
                "Deputy Clerk of the District Court.

"Said applicants also file affidavit of John F. Stone in support of said application, which said affidavit is in matter and form as follows, to-wit:

"Territory of Oklahoma, Pawnee County, ss.

"Personally appeared John F. Stone, who, being first duly sworn, says, that he has examined the records of the office of the territorial auditor to determine when the board of equalization of said territory finished its labors for the year 1894, and that said records show that the said board finished its labors on the 11th day of July, 1894.

"JOHN F. STONE.

"Subscribed and sworn to before me this 16th day of November, 1894.

"(SEAL.)                    J. H. HAVIGHORST,
                    "Clerk District Court.

"At the same time appeared John F. Stone, Wm. M.

Allison, A. J. Biddison and C. J. Wrightsman, on behalf of certain tax payers and warrant holders of said county, and each, showing his interest in the matter under consideration, duly protested against the funding of certain warrants of said Pawnee county.

"Whereupon the court, having fully considered the application of said petitioners and the proof filed in support thereof, finds that the assessed valuation of the taxable property of said Pawnee county, in Oklahoma Territory, aggregates the sum of two hund ed and twenty-two thousand, three hundred and eighteen dollars.

"That the territorial board of equalization finished its labors upon the assessment for the year 1894, upon the 11th day of July of said year.

"That the limit upon the indebtedness of said county is, by act of congress, fixed at the sum of eight thousand, eight hundred and ninety-two dollars and seventy-two cents.

"That the legal outstanding warrants of said Pawnee county, principal and interest, aggregate the sum of eight thousand eight hundred dollars.

"It is, therefore, considered, ordered and adjudged by the court, that the bonds of said county be issued to fund said debt in the amount of eight thousand, eight hundred dollars, and that the following list of warrants shall be included in said bonding and that said warrants shall be paid, principal and interest, out of the proceeds of the sale of said bonds, a list of which said warrants is hereto attached and made a part hereof, marked 'Exhibit C.'

"It is further ordered by the court that all of the outstanding warrants of said Pawnee county, excepting those included in 'Exhibit A,' be and are excluded from said bonding, a list of which said warrants is hereto attached, marked 'Exhibit D.'

"Whereupon, the judge of said court, in open court, signs the bonds of said county numbered one (1) to eighteen (18), inclusive, each of the first seventeen (17) bonds being for the sum of five hundred dollars each, and bond number eighteen (18) being for the sum of three

hundred dollars, said bonds to become due in ten years, and payable after the end of three years, at the option of the county, and drawing interest at the rate of 6 per cent. per annum, payable annually, amounting in all to the sum of eight thousand eight hundred dollars.

"Whereupon, in open court, the judge of said court delivers said bonds to L. G. Poe, the county treasurer of said county, taking his receipt therefor, and at the same time the said county treasurer receipts to the said county clerk for the said bonds, at which time the court instructs the county treasurer that such bonds shall not be sold for less than par with accrued interest, in cash, or the warrants of said Pawnee county included in this bonding, and that he shall not pay any of the warrants included in this bonding in any other manner or from any other fund than that received from the sale of these bonds.

"To each and every such ruling the attorneys for protestants then and there duly excepted and except.

"And to each of said rulings by which any of said warrants are included in this bonding, attorneys for protestants then and there duly excepted and except.

"And to each of said rulings by which any of the warrants included in 'Exhibit D' excepting road and bridge warrants are excluded from said bonding, said attorneys for protestants then and there duty excepted and except.

"Whereupon, attorneys for protestants prayed an appeal to the supreme court of Oklahoma Territory, and were granted fifteen days in which to prepare and file a case-made, the judgment of this court being suspended upon the filing of a bond in the sum of $500, and the county treasurer of said Pawnee county was thereupon directed that he should not in any manner dispose of said bonds pending said appeal."

From this judgment Roy V. Hoffman, feeling himself aggrieved, brings the case here and assigns errors as follows:

"The court erred :

"1. In including any of the warrants issued prior to

July 11, 1894, in the list of warrants to fund which bonds were issued.

"2. In excluding any of the warrants issued on or subsequent to July 11, 1894, from the list of warrants to fund which bonds were issued.

"3. Said court erred in holding that warrants issued to deputy sheriffs for serving process were valid.

"4. Said court erred in excluding the warrants of said county numbered from 522 to 528 held by the plaintiff from said bonding.

"5. Said court erred in holding that the interest on valid warrants was invalid when it exceeded four per cent. of the assessed valuation.

"Wherefore, the plaintiff in error prays that said judgment so rendered may be reversed, set aside and held for naught, and that the judgment may be ordered to be rendered in favor of the plaintiff in error and against the defendant in error, and that the plaintiff in error be restored to all rights he has lost by the rendition of said judgment, and for such other and further relief as to the court may seem just."

The case was submitted on briefs and oral argument. Judgment of the lower court affirmed.

*John F. Stone*, for plaintiff in error.

*A. J. Seay* and *Henry E. Asp, J. W. Shartel* and *J. R. Cottingham*, for defendant in error.

The opinion of the court was delivered by

SCOTT, J.: This cause involves the same questions presented to the court in the case of *Nicholas and William Sauer v. J. W. McMurty*, as a tax payer and county attorney of Roger Mills county, and was consolidated with this one for the purpose of argument before this court.

The question in the Pawnee county case comes to this court by the petition in error of holders of warrants issued subsequent to the first assessment, who

claim to be prejudiced by the action of the district court of Pawnee county, excluding warrants issued since the assessment in excess of the four per cent. limit from the bonding process and including warrants issued prior to that time therein. The presiding judge below, Justice Bierer held to the view that said county could create a debt within the law prior to an assessment, not in excess of four per centum of the value of the taxable property in said county to be ascertained by the first assessment. Chief Justice Dale concurs in this view. Justice Burford entirely dissents and still adheres to the view expressed in the New Vienna Bank case, as applicable to this case as well as that one. Justice McAtee concurs fully with the reasoning in this opinion, notwithstanding his decision in the Roger Mills county case, and all the Justices concur in the conclusions reached herein—excepting Justice Burford, in affirming the judgment of the court below.

The case of Roger Mills county comes here from a perpetual injunction granted by the district court of that county against the payment of any warrants issued prior to the assessment. on the petition in error of one of the holders of these warrants, complaining of the granting of such an order.

The case of *The City of Guthrie v. The New Vienna Bank* was decided by this court on the 7th day of September, 1894, and the language used in that case has been construed by counsel for plaintiff in error as decisive of this case, and the public at large has to some extent regarded that decision as the expression of the court upon the federal limitation act of July 30, 1886.

The indebtedness involved in the New Vienna Bank case arose before the passage of the Organic Act of Oklahoma Territory, May 2, 1890, and in the consideration of this case we will entirely eliminate that case and treat it independently as it now stands before us

on a rehearing granted at the January term of this court.

Without further reference to the New Vienna Bank case or the case from Roger Mills county in this opinion, we will enter upon a discussion of this one independently and upon its full merits as presented by the record and the laws of the United States and of this Territory as applicable thereto.

The various assignments of error presented and relied upon by counsel for plaintiff in error, are stated in one proposition, as follows:

"Are the warrants issued by the counties in the Cherokee strip prior to the date when the first assessment was finally completed (July 11, 1894,) by the territorial board of equalization, valid either in whole or in part?"

Counsel then submits propositions which may be classified as follows:

1. Under the act of congress approved July 30, 1886, relating to municipal debts in territories of the United States, all debts of municipal corporations in Oklahoma in excess of 4 per cent. of the valuation of the taxable property therein, as shown by the last preceding annual assessment for territorial and county purposes, are void.

2. That all warrants issued prior to the first assessment for territorial and county purposes in any of the counties of Oklahoma are void.

3. That warrants issued in excess of the constitutional limit are void in the hands of innocent purchasers, and when converted into bonds, are likewise void, no matter what language the recitals may contain.

4. That the assessment cannot become the basis of a debt until it has been finally passed upon by the territorial board of equalization.

22

5. That there is no relief for the holder of such void claims, either in law or equity.

Counsel for defendant in error states the question involved to be almost literally the same as follows:

"Are county warrants issued by the counties of Oklahoma, prior to the making of the first assessment for the purpose of taxation, invalid?"

It is submitted by counsel for defendant in error that the so-called 4 per cent. limitation imposed by the act of 1886, is not involved in this case in any manner, and no proposition presented by the record is, under the law, affected thereby.

Three propositions are stated briefly as follows:

"First. That the Organic Act of the Territory of Oklahoma, is, in and of itself, a complete instrument defining the exact limit of the organic power of the Territory without reference to any other laws passed upon kindred subjects.

"Second. That the act of 1886, as it is construed in the New Vienna Bank case, is repugnant to the act of congress creating the Territory of Oklahoma, and especially that part of the act creating counties and carrying with it the implied power of the counties to maintain their organization instanter without revenue; and

"Third. The act is excluded from operation upon counties and possibly other municipalities within the terms of § 28 as being inapplicable to the conditions and necessities of the people."

It is also contended by counsel for defendant in error that the contemporary construction of the various acts by those officers charged with the duty of carrying their provisions into execution should be regarded as of great moment in the determination of their legal effect at this time.

We collate and quote the several statutes affecting the case. The act of July 30, 1886, known as the Federal Limitation act, contains provisions as follows:

Section 1 forbids the passage of local or special laws in certain enumerated cases, by any of the territories now or hereafter organized.

Section 2 reads:

"That no territory of the United States now or hereafter to be organized, or any political or municipal corporation or subdivision of any such territory, shall hereafter make any subscription to the capital stock of any incorporated company, or company or association having corporate powers, or in any manner loan its credit to or use it for the benefit of any such company or association, or borrow any money for the use of any such company or association."

Section 3 reads:

"That no law of any territorial legislature shall authorize any debt to be contracted by or on behalf of such territory except in the following cases: To meet a casual deficit in the revenues, to pay the interest upon the territorial debt, to suppress insurrections, or to provide for the public defense, except that in addition to any indebtedness created for such purposes, the legislature may authorize a loan for the erection of penal, charitable, or educational institutions for such territory, if the total indebtedness of the territory is not thereby made to exceed one per centum upon the assessed value of the taxable property in such territory as shown by the last general assessment for taxation. And nothing in this act shall be construed to prohibit the refunding of any existing indebtedness of such territory or of any political or municipal corporation, county, or other sub-division therein."

Section 4 reads:

"That no political or municipal corporation, or other sub-division in any of the territories of the United States shall ever become indebted in any manner or for any purpose to any amount in the aggregate, including existing indebtedness, exceeding four per centum on the value of the taxable property within such corporation, county, or sub-division, to be ascertained by the last assessment for territorial and county taxes previous to the incurring of such indebtedness; and all bonds or obligations in excess of such

amount given by such corporation shall be void; that nothing in this act contained shall be so construed as to affect the validity of any act of any territorial legislature heretofore enacted, or of any obligations existing or contracted thereunder, nor to preclude the issuing of bonds already contracted for in pursuance of express provisions of law; nor to prevent any territorial legislature from legalizing the acts of any county, municipal corporation, or sub-division of any territory as to any bonds heretofore issued or contracted to be issued."

Section 7 reads:

"That all acts and parts of acts hereafter passed by any territorial legislature in conflict with the provisions of this act shall be null and void."

The latter portion of § 1, Organic Act of Oklahoma Territory, passed May 2, 1890, reads:

" * * * Whenever the interest of the Cherokee Indians in the land known as the Cherokee Outlet shall have been extinguished and the president shall make proclamation thereof, said Outlet shall thereupon, and without further legislation, become a part of the Territory of Oklahoma. Any other lands within the Indian Territory not embraced within these boundaries shall hereafter become a part of the Territory of Oklahoma whenever the Indian Nation, or tribe owning such lands, shall signify to the president of the United States in legal manner its assent that such lands shall so become a part of the Territory of Oklahoma, and the president shall thereupon make proclamation to that effect."

The material portion of § 14, of the act of March 3, 1893, 27 Statutes at Large, 645, opening the Cherokee Outlet and the Pawnee and Tonkawa Indian reservations to settlement, reads:

"Before any of the aforesaid lands are opened to settlement it shall be the duty of the secretary of the interior to divide the same into counties, which shall contain, as near as possible, not less that five hundred square miles in each county. In establishing said county lines the secretary is hereby authorized to

extend the lines of the counties already located so as
to make the area of said counties equal, as near as
may be, to the area of the counties provided for in
this act."

. The second clause of the Organic Act passed May 2,
1890, contains this provision:

"That for the purpose of facilitating the organiza-
tion of a temporary government in the Territory of
Oklahoma, seven counties are hereby established
therein, to be known, until after the first election in
the territory, as First county, the Second county, the
Third county, the Fourth county, the Fifth county, and
the Sixth county, the boundaries of which shall be
fixed by the governor of the territory until otherwise
provided by the legislative assembly thereof. The
county seat of the First county shall be at Guthrie;
the county seat of the Second county shall be at Okla-
homa City; the county seat of the Third county shall
be at Norman; the county seat of the Fourth county
shall be at El Reno; the county seat of the Fifth county
shall be at Kingfisher; the Sixth county seat shall be
at Stillwater; the Seventh county shall embrace all
that portion of the territory lying west of the one
hundredth meridian, known as the Public Land
Strip, the county seat of which shall be at Beaver:
*Provided,* That the county seats located by this act
may be changed in such manner as the territorial leg-
islature may provide."

Section 2 of the Organic Act, reads:

"That the executive power of the Territory of Okla-
homa shall be vested in a governor, who shall hold
his office for four years, and until his successor shall
be appointed and qualified, unless sooner removed by
the president of the United States. The governor
shall reside within said territory; shall be commander
in chief of the militia thereof; he may grant pardons
for offenses against the laws of said territory, and re-
prieves for offenses against the laws of the United
States, until the decision of the president can be made
known thereon; he shall commission all officers who
shall be appointed to office under the laws of said ter-

ritory and shall take care that the laws be faithfully executed."

Section 7 of the Organic Act (May 2, 1890,) reads:

"That all township, district and county officers, not herein otherwise provided for, shall be appointed or elected, as the case may be, in such manner as shall be provided by the governor and legislative assembly of the territory. The ·governor shall nominate, and by and with the advice and consent of the council, appoint all officers not herein otherwise provided for, and in the first instance the governor alone may appoint all such officers, who shall hold their offices until the end of the first session of the legislative assembly." ·

Section 6 of the Organic Act (May 2, 1890,) reads:

"That the legislative power of the territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of soil; no tax shall be imposed upon the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents, nor shall any law be passed impairing the right to private property, nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to the taxation shall be taxed in proportion to its value: *provided,* that nothing herein shall be held to prohibit the levying and collecting license or special taxes in the territory from persons engaged in any business therein, if the legislative power shall consider such taxes necessary."

In pursuance of the above grant of legislative power there has been enacted a complete political code. The powers, duties and liabilities of municipalities and municipal officers are clearly defined and laid down, and all these laws, except those passed at the last session of the legislative assembly, were in existence on the 16th day of September, 1893, when the Chero-

kee Outlet was opened for settlement, and under the law became a part of the Territory of Oklahoma.

Pawnee county, the municipality involved in this case, is a part of the country so opened to settlement on the 16th day of September, 1893, by proclamation of the president, under the act of March 3, 1893.

Section 11 of the Organic Act put in force certain enumerated chapters of the compiled laws of the state of Nebraska, to remain in effect until the adjournment of the first session of the legislative assembly, and under said laws, county, district and township offices were created, and under § 7 of the Organic Act, said offices were filled by proper appointment.

Section 28 of the Organic Act reads:

·"That the constitution and all the laws of the United States not locally inapplicable shall, except so far as modified by this act, have the same force and effect as elsewhere within the United States; and all acts and parts of acts in conflict with the provisions of this act are, as to their effect in said Territory of Oklahoma, hereby repealed: *provided,* that section eighteen hundred and fifty of the Revised Statutes of the United States shall not apply to the Territory of Oklahoma."

Thus, we have stated the propositions and the statutes and provisions alleged to have application thereto, but to still more simplify the real question and more clearly define and set out our complicated legal status, present boundaries and contemporaneous history, a slight retrospective review will be necessary.

Oklahoma Territory, as now constituted by the various laws of congress, embraces an area of about 39,000 square miles, and contains twenty-two counties.

On the 23d day of March, 1889, President Harrison, by executive proclamation, under the act of March 2, 1889, before the organization of Oklahoma, declared the original territory embraced within the boundaries

of old Oklahoma open to settlement, on the 22d day of April, 1889.

On the 2d day of May, 1890, the Organic Act of Oklahoma territory was passed and a temporary government, by the name of the Territory of Oklahoma, was erected. (See 26 Stat. at Large, p. 81.)

By the terms of § 4, of said Organic Act, this territory was sub-divided into seven counties, to be known until after the first election in the territory as First county, now Logan county; Second county, now Oklahoma county; Third county, now Cleveland county; Fourth county, now Canadian county; Fifth county, now Kingfisher county; Sixth county, now Payne county, and Seventh county being the tract of land known as the Public Land Strip, and now Beaver county.

As heretofore stated, by the terms of § 11 of the Organic Act, certain chapters of the compiled laws of the state of Nebraska were put in force, in so far as they were locally applicable and not in conflict with the laws of the United States, until after the adjournment of the first session of the legislative assembly, and, under proper heads, certain township, county and district offices were created. Section 7 of the Organic Act provides that in the first instance the governor alone shall appoint all such officers and that they shall hold their offices until the adjournment of the first session of the legislative assembly. George W. Steele, as governor of Oklahoma, appointed a full corps of county, township and district officers for all of said counties so established by the Organic Act and the laws of Nebraska put in force by said act, and said officers immediately entered upon the discharge of their duties.

Upon the adjournment of the first session of the legislative assembly of Oklahoma Territory, all these

offices having been created thereby, the laws of Nebraska had served the purpose intended by congress and were no longer applicable or in force. The first legislative assembly of Oklahoma Territory convened on the 27th day of August, 1890, and adjourned on the 24th day of December, 1890. The published Statutes of Oklahoma, 1890, then took the place of the laws of Nebraska, and the Organic Act stood as our constitution, all of which has so remained from said time until the present, except as amended or repealed by subsequent sessions of congress or the territorial legislature.

On the 22d day of September, 1891, the country now known as the counties of Lincoln and Pottawatomie of the Territory of Oklahoma, were opened to settlement by proclamation of the president of the United States, dated September 18, 1891, issued under and in pursuance of an act of congress approved March 23, 1891, said counties then being designated as A and B counties, and being a part of the Sac and Fox and Iowa nations of Indians, the citizen band of Pottawatomie Indians and the Absentee Shawnee Indians. By the proper authority a full corps of county, township and district officers for said counties were appointed, and said officers entered upon the duties of their respective offices, Geo. W. Steele still being governor of the territory.

On the 19th day of April, 1892, that country known as the Cheyenne and Arapahoe country was by proclamation of the president of the United States, issued under the act of congress approved March 3, 1891, opened for settlement, and in pursuance of existing provisions of law, Hon. A. J. Seay being governor, a full corps of county, township and district officers were appointed, who proceeded to exercise their functions as such. The country so opened was sub-divided into the counties of C, now Blaine county; D, still D

county; E, now Day county; F, now Roger Mills county; G, still G county, and H, now Washita county.

On the 16th day of September, 1893, the Cherokee Outlet and the Pawnee and Tonkawa Indian reservations were, by executive proclamation, opened to settlement under the act of March 3, 1893, and divided into the counties of K, now Kay county; L, now Grant county; M, now Woods county; N, now Woodward county; O, now Garfield county; P, now Noble county; and Q, now Pawnee county, and in pursuance of existing provisions of law, the governor of said Territory, Wm. C. Renfrow, appointed a full corps of county officers for each of the counties contained in said territory so opened to settlement. This country so opened, consists of lands formerly owned by the Cherokee, Pawnee and Tonkawa nations of Indians.

On the 23d day of May, 1895, by proclamation of the president, the Kickapoo Indian reservation was opened to settlement under the provisions of the act of congress of March 3, 1893. No new counties were organized, but said country had been attached to Lincoln and Oklahoma counties for judicial purposes.

On the 29th day of May, 1890, the supreme court of the Territory of Oklahoma was organized, and said Territory of Oklahoma was divided into three judicial districts under § 9, of the Organic Act, and upon the opening of A and B counties, now Lincoln and Pottawatomie counties, said counties were attached to and made a part of the First and Third judicial districts of said territory and courts established therein. Upon the opening of the Cheyenne and Arapahoe country the Territory of Oklahoma was redistricted and that country became a part of the Second judicial district of said territory. Upon the opening of the Cherokee Outlet and Pawnee and Tonkawa reservations, the territory was again redistricted, and said reservations were embraced within proper judicial districts. By

the act of congress of December 21, 1893, two additional associate justices of the supreme court were appointed and the Territory of Oklahoma was again redistricted into five judicial districts, and so stands at this time.

Thus it will be observed that from and after the passage of the Organic Act, May 2, 1890, this territory has had a complete government provided by congress, and the laws of the territory passed by the legislative assembly.

In each of the so organized and established counties a full set of officers were appointed by the proper authority, and the entire machinery of county government put into operation before any assessment was ever had, and all of them, including Pawnee county, now in question, created indebtedness and incurred liabilities in pursuance of their supposed power, prior to making an assessment for county and territorial taxes.

From this review the construction of officers charged with the execution of these laws, from the president of the United States down, so far as the appointment and qualification of officers and the establishment and organization of the municipalities embraced within the boundaries of Oklahoma Territory have been involved, can be seen, and such construction, if made honestly and in good faith, should have great weight in the determination of this question.

It is conceded that the various officers charged with the execution of these laws did so properly, and that the Cherokee Outlet, as well as other portions of Oklahoma, was opened to settlement, the counties established, offices created and officers appointed in accordance with the laws enacted for that purpose.

In fact, all parties go hand in hand down to the point where the country is opened, the counties or

municipalities defined and established, the various offices created and filled by the proper authority, and the officers duly qualified as provided by law, and then, and not until then, is issue taken.

Thus, at length, we have squarely reached the question, and in dealing with it we are not unmindful of its importance in the commercial world and the deep responsibility upon the court in arriving at a correct determination.

We have, therefore, desired to omit nothing that would achieve this end. We have received much valuable aid from the very able and elaborate briefs filed by counsel on either side, all of which discloses evidence of deep and careful research, as well as a great familiarity with the subject. Yet we will be unable to adopt the theory of either side, as a whole, but believe the conclusion reached by the court, after a full consideration of arguments and briefs, together with extensive independent research and deliberation, to be correct under the law, and just in equity and good conscience.

The plaintiff in error contends that the end has been reached because there are no provisions of law for raising revenue for the purpose of enabling the authorities to discharge the functions of county government, and that no valid debt can be incurred until there has been an assessment, and for these reasons the county government must be brought to a standstill.

The defendant in error contends that the provisions of § 4 of the act of July 30, 1886, are inapplicable, or have been repealed, and that, while it is true that there are no adequate laws in force for the raising of revenue, yet, under the implied corporate powers of the municipalities, valid evidences of debt can be issued, and such municipalities enabled to exist and discharge their functions, under the law, notwithstanding.

It is established doctrine that a municipality has

the implied power to incur indebtedness whenever it is necessary to do so, to carry out any power conferred upon it, unless the contracting of such debt is prohibited by statute.

It follows then that Pawnee county upon being fully established, organized and equipped with all necessary officers as required by law, had the power to contract debts for the necessary purpose of existence, unless § 4, of the Act of July 30, 1886, was in force to prevent it. This statute was passed nearly four years before Oklahoma as a territory had any existence, and contemplated existing indebtedness by the use of the words "including existing indebtedness." While this is true, there is no doubt in the mind of the court that all the laws of the United States or the Territory of Oklahoma, in force in old Oklahoma, so far as applicable, became operative *eo instante* upon the establishment and organization of Pawnee county. It was made a part of Oklahoma Territory by act of congress and it was of course intended by congress that it should be subject to and governed by the same laws. Section 28, of the Organic Act, placed the constitution and all laws of the United States not locally inapplicable in force in Oklahoma, except as modified in said Organic Act, the same as elsewhere in the United States and repealed all acts and parts of acts in conflict with said Organic Act as to their effect in Oklahoma.

It is apparent then, and should not be controverted, that all acts and statutes of the United States applicable to our country and conditions and not in conflict with the provisions of the Organic Act, immediately took effect upon the passage thereof, and also went into effect and became applicable to the territory added to our domain from time to time under the laws of congress as heretofore stated.

It would not support good reason to contend that unless an entire statute were applicable at once upon

the passage of the Organic Act, that it never could become applicable, or that the time never could arrive when, if in conflict with the Organic Act, the repugnancy would no longer exist. So, then, the contention of counsel for plaintiff in error that "locally inapplicable" refers to place and not to time, is unsound. Before us we have a living example. The domain now embraced in the boundaries of Pawnee county could in no manner be affected by the act of 1886, until such time as it became a municipality and a part of a territory of the United States. Under the very argument of counsel for plaintiff in error, the statute could have no application for the purpose of laying the foundation of a debt until such time after the opening of the Cherokee Outlet and the organization and equipment of the county as an assessment had been made for territorial and county taxes.

It is clear that time, in this case, has as much to do with the applicability of this statute as place, and that § 4 of the act of 1886 could have no application to Pawnee county until after the first assessment of the taxable property therein for territorial and county taxes was made, or that said act is in conflict with some of the other provisions of law, and hence repealed by § 28 of the Organic Act as to its application in Pawnee county. Time has intervened since the organization of the county to make the law applicable, or has rendered it no longer repugnant, which is the same in effect.

Neither is it sound to contend that § 4 could only have such application to Pawnee county as it had to the balance of Oklahoma Territory. This would be true if Pawnee county were in the exact legal status as the balance of Oklahoma. If the status of Pawnee county as a municipality is such that it can come within the provisions of said act, then just so far is said act applicable thereto, and just so far is the act

repealed as to its effect therein by § 28 of the Organic Act.

When Pawnee county was organized and ready for business, could § 4 be wholly applicable?

This question will have to be answered in the negative. It could not be applicable, because Pawnee county had not had an assessment of the taxable property therein for county and territorial taxes, in order to lay the foundation so that a debt might be incurred under said act  We have said that a corporation has the implied power to contract a debt when necessary to carry out any obligation laid or power conferred upon,it, unless prohibited by statute.

We are certain that congress recognized this as a principle of law, and when by express enactment these counties were created it was intended that they should exist by the exercise of this power, or means of raising revenue would have been provided.  It would be attributing criminality, negligence, imbecility, one or all, to congress to hold that either by oversight, ignorance or design, these counties, populated in a day with a wild rush for homes or greed, were to be left in such a pitiable and helpless condition without revenue or any means whatever for the protection of life, liberty or property of the person, by a proper enforcement and execution of the law. Indeed, as has been suggested, the making of an assessment itself  could  not be effected because it would necessarily involve the creation of a debt, which, under the contention of counsel, would be void.

It was the undoubted purpose of congress to have these counties thus exist, and the intention that the provisions of § 4 should be held inapplicable or repealed as to its effect in such cases.

It may be asked what if the necessities or prodigality of the county government should be so great as to

run the county in debt to an amount beyond the limit of 4 per cent. of the taxable property prior to an assessment? It may be further asked if, under this construction, there is any limit at all before an assessment is made? In answer to this we would be compelled to hold that until an assessment has been made, §4 can have no application whatever, (1) because no assessment has ever been made, and (2) because under the statute there is no means of applying the 4 per cent. limitation except upon the basis laid by the assessment. Four per cent. of the taxable property prior to an assessment is an unknown quantity and cannot be mathematically determined, and §4 of said act can only be held to be wholly applicable or wholly inapplicable prior to an assessment. It would be a mistaken view to hold that §4 makes reference to the last assessment as a period when the first indebtedness might be incurred instead of regarding it as a basis for the ascertainment of the amount of indebtedness that may be created. This must be true, for in 1886, when the act was passed, there was no territory in existence where no assessment had been made therein, and said act was passed with especial reference to existing territories and existing indebtedness, counties completely organized and equipped, and assessments of the taxable property made therein. There is good reason in regarding §4 as inapplicable prior to an assessment, but not afterward. After the assessment is made this municipality comes clearly within the statute. It provides "that no political or municipal corporation or other sub-division in any of the territories of the United States shall ever become indebted in any manner or for any purpose to any amount in the aggregate, including existing indebtedness, exceeding 4 per centum on the value of the taxable property within such corporation, county or subdivision, to be ascertained by the last assessment for

territorial and county taxes previous to the incurring of such indebtedness; and all bonds or obligations in excess of such amount given by such corporation shall be void."

Pawnee county is a municipal corporation. It is located in a territory of the United States. The taxable property therein has been assessed as provided by law. The laws of the United States and the territory have application thereto as any other municipality whose legal status is the same, rendered so by the same power and authority. The only difference, if that amounts to a legal difference, is that a debt has been contracted previous to the assessment. It is also true that debts were contracted and in existence in the territories of the United States in 1886 when the act was passed. This is evident from the use of the words "including existing indebtedness." When this statute became applicable to Pawnee county, said Pawnee county having an existing indebtedness, having had an assessment, and being a municipal corporation and situated in a territory of the United States, who will undertake to define the distinction between Pawnee county in this condition and a county in the Territory of New Mexico in 1886, at the time of the passage of said act, said county in New Mexico being a municipal corporation, having had an assessment, having an existing indebtedness and being situated in a territory of the United States. Certainly no one would attempt such a distinction. So we can see no escape from the conclusion that the valid indebtedness incurred in Pawnee county prior to an assessment, must be regarded as comparable to the indebtedness existing in similar municipalities in other territories of the United States in 1886 when this act was passed.

We presume congress intended that if existing indebtedness reached or exceeded 4 per cent. of the

assessed valuation, that no greater debt could be incurred, but that such an impoverished condition of affairs would appeal to the wisdom of the proper legislative authority. There are many ways to relieve such a condition, but a discussion of the matter need not take place here. We have not to deal with that phase of the question. Neither have we to deal with the suggestion of counsel for plaintiff in error, which is wholly outside of the record, that corrupt officers, unless restrained by the limitation referred to, will hopelessly burden a municipality with debt. We can only say that if·debts incurred are fraudulent, there is ample relief, but the court, so far as this record is concerned, is bound to presume that the indebtedness was necessarily created and valid so far as it was incurred within existing provisions of law.

From this reasoning, it follows that § 4 of the act of July 30, 1886, did not become applicable to Pawnee county until after an assessment was had for territorial and county taxes, or that its provisions were repealed, as to their effect therein, by § 28 of the Organic Act, and that all indebtedness created within existing provisions of law, in said county, are valid and binding obligations upon the county. Further, that if, at the time of the first assessment, the existing indebtedness reaches, or is in excess of, 4 per cent. of the taxable property of said county, no more indebtedness can be created until such time as the taxable property shall have been increased, or the existing indebtedness shall have been liquidated to such an extent that the amount of debt to be created shall not exceed 4 per cent. of the value of the taxable property, to be ascertained by the last assessment for territorial and county taxes.

It, therefore, appearing from the record that·bonds were issued within the provisions of law by the lower court, its judgment will be affirmed with costs.

By the Court: It is so ordered.

Bierer, J., having presided below, not sitting.

Burford, J., dissents.

McAtee, J., concurs fully.

Dale, C. J., concurs in the conclusion in affirming the judgment, but does not agree that a debt exceeding 4 per cent. may be contracted prior to the first assessment, or at any other time, so long as § 4 of the act of 1886 is in force.