**RILEY v. CARTER, State Auditor, et al.**

No. 24903.   Sept. 8, 1933.

Rehearing Denied Oct. 9, 1933.

Fletcher Riley, pro se.

J. Berry King, Atty. Gen., and Randell S. Cobb, Asst. Atty. Gen., for respondents.

W. A. Ledbetter, amicus curiae.

BIGGERS, Special V. C. J.   This is an original action instituted in this court by the petitioner, Fletcher Riley, who alleges that he is a member of the Supreme Court of the state of Oklahoma; that he was elected a Justice of this court from the Ninth district at the general election held

in November, 1930, and assumed the duties of his office in January, 1931; that at the time of his election, section 3481, O. S. 1931, Laws of Oklahoma 1929, chapter 273, sec. 1, was in full force and effect, and that said act fixed the salary of a Justice of the Supreme Court of this state at the sum of $7,500 per year, payable monthly. He further alleges that the respondent F. C. Carter is the duly elected, qualified, and acting State Auditor, and that the respondent Ray O. Weems is the duly elected, qualified, and acting State Treasurer; that for the month of July, 1933, he presented to the respondent F. C. Carter, State Auditor, in the form required by law, a claim for his salary for said month in the sum of $625, and that said F. C. Carter, State Auditor, refused to allow said claim in the amount of $625, but did allow said claim for the sum of $500, and issued his warrant payable to petitioner for the sum of $500, which petitioner refused to accept. He further alleges that the respondent F. C. Carter, State Auditor, will in the future refuse to allow the claim of petitioner for his salary as a Justice of the Supreme Court of this state in any sum other than the sum of $500 per month, and that the respondent Ray O. Weems, State Treasurer, will refuse to pay any warrant issued in payment of his salary in excess of the sum of $500, and he prays this court that it issue a writ of mandamus commanding and requiring the respondent F. C. Carter, State Auditor, to allow said claim in the sum of $625, and to issue a warrant therefor, and commanding and requiring the respondent Ray O. Weems, State Treasurer, to pay said warrant so issued, or to indorse thereon the proper notation as is by law provided for the allowance of interest thereon.

The petitioner contends that, his salary being fixed at the sum of $7,500 per year at the time of his election, and being payable monthly at the rate of $625 per month, any act of the Legislature which has for its purpose or the result of which would amount to a change in said salary during his term of office is contrary to and prohibited by the Constitution of this state, and that if the Legislature was without constitutional authority to directly change his salary during his tenure of office, they could not indirectly accomplish this purpose by withholding their appropriation.

The respondents have filed separate responses to the petition of petitioner, and the respondent F. C. Carter, State Auditor, has alleged in his response: (1) He admits that petitioner filed with him his claim for the sum of $625 for the salary due petitioner

as a Justice of the Supreme Court for the month of July, 1933, and that respondent allowed said claim in the sum of $500 but disallowed said claim in the sum of $125 by indorsing thereon "Claim disallowed in the sum of $125 by reason of inadequate appropriation", and that he drew and tendered to petitioner a warrant in the sum of $500 payable to petitioner, but that petitioner refused to accept same; (2) that respondent refused to allow said claim in the sum of $625 for the reason that the General Appropriation Act, Senate Bill No. 27, passed at the Regular Session of the 14th Legislature, appropriated for the fiscal year beginning July 1, 1933, and ending June 30, 1934, the sum of $54,000 for the payment of the salaries of the nine Justices constituting the Supreme Court, and incorporated in said bill the following provisions: "Provided, That the salaries provided in this bill shall be paid monthly in twelve equal payments for each year," and that by reason thereof he was and is without authority to issue a warrant for the July, 1933, salary of petitioner in a sum in excess of the sum of $500: (3) that respondent is without authority to issue to petitioner a warrant in the sum of $625 for his July, 1933, salary because same would be for a sum in excess of the amount appropriated by the Legislature for that purpose, and therefore in violation of section 3568, O. S. 1931; (4) that the respondent is without authority to issue a warrant to petitioner in the sum of $625 for his July, 1933, salary for the reason that the issuance of a warrant in that amount would be in violation of section 55, art. 5, of the Constitution of Oklahoma; (5) that the appropriation of the public funds of the state is strictly a legislative prerogative, and that neither he, as State Auditor, nor this court, as a part of the judicial branch of this government, can make an appropriation or increase an appropriation made by the Legislature, for to do so would violate section 1, art. 4, of the Constitution of Oklahoma; (6) that the writ of mandamus is a discretionary writ, and even though petitioner may show himself as entitled to a right for which mandamus may be the proper remedy, that the economic conditions now existing in this state and generally are such that the court in the exercise of the discretion vested should refuse the issuance of the writ.

The respondent Ray O. Weems, State Treasurer, has filed his response alleging: (1) That there was presented to him by the State Auditor a warrant drawn upon the general funds of this state payable to peti-

tioner and in the sum of $500 in payment of the July, 1933, salary of petitioner as a Justice of the Supreme Court of this state, and that he registered same as a payable warrant, and that said warrant has never been presented to him for payment; (2) that no warrant in the sum of $625 in payment of the July, 1933, salary of petitioner as a Justice of the Supreme Court of this state has ever been presented to him, and that, therefore, he has not failed or refused to perform any duty enjoined upon him by law in so far as the payment of petitioner's salary for the month of July, 1933, is concerned; (3) that, while no warrant in the sum of $625 for the July, 1933, salary of petitioner has been presented to him, if such situation should arise he would be without authority to either register or pay same because to do so would be in violation of sections 3558, 3568, and 3764, O. S. 1931, and section 55, art. 5, Oklahoma Constitution; and he further adopts as his defense all of the allegations set forth in the response filed herein by F. C. Carter, State Auditor.

From this it will be seen that both respondents contend that to have issued a warrant in the sum of $625 for the July, 1933, salary of petitioner and to have paid said warrant would have violated and will violate the provisions of the Constitution and statutes quoted, and that this court is without authority to either make an appropriation of the public funds of this state or to increase an appropriation already made by the Legislature, and that even though we hold that the petitioner has shown a clear legal right to the writ, this court should, in the exercise of its discretion, withhold same. It will be seen, then, that the real question to be decided is, Did the framers of the Constitution and the people who adopted same fail to make an appropriation in the Constitution itself for the payment of the salaries of the judges of this state and thereby make the judiciary of this state dependent upon the Legislature for their compensation and the amount thereof? Clearly this result follows if no appropriation is made in the Constitution to pay the salaries of the judges of this state, as no other branch of this government has any right or authority to make appropriations save the people themselves or their representatives in the Legislature, and it is provided in the Constitution that no money can be drawn from the treasury of this state except in pursuance of an appropriation by law.

In view of the importance of the question involved, we shall first discuss the suggestion made in the pleadings, oral argument, and briefs filed, that we should consider the effects flowing from the issuance of the writ, and that although we may determine that petitioner may have shown a clear legal right for which mandamus is an appropriate remedy, we should in the exercise of our discretion withhold same.

That the writ of mandamus is not a writ of right, but is a discretionary writ, is firmly established, and, being such, courts, in awarding or denying such writ, exercise a judicial discretion, and in the exercise of which should be guided by the results that follow the issuance or denial of such writ, and if the evils following the issuance of the writ will outweigh the evils sought to be corrected, the court may, in the exercise of its discretion, refuse to issue the writ even though petitioner may have shown a clear legal right for which mandamus is an appropriate remedy. Stearns v. Sims, 24 Okla. 623, 104 P. 44; Board of Excise of Oklahoma County v. Board of School Directors of District No. 27 of Oklahoma County, 31 Okla. 553, 122 P. 520. In view of the settled practice relating to writs of mandamus and the discretion exercised by courts in the granting or refusing of said writs, this court might give serious consideration to the contention asserted in this case that the court should take judicial notice of existing economic conditions and refuse to issue the writ even though the petitioner may have shown himself entitled thereto, if a decision on this question involved only the sum of $125 per month to petitioner, but, as we view it, this phase of the question is of no consequence, for a determination of the question involves a continuance in this state of a constitutional government divided into three separate branches, the legislative, the executive, and the judicial, and the continuance in this state of an independent judiciary. It is admitted by all that at the time the respondent was elected a Justice of this court, his salary then, and his salary now, was, and is, fixed at the sum of $7,500 per year, payable monthly, or the sum of $625 per month. Section 10, art. 23, of our Constitution provides:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; nor shall the term of any public official be extended beyond the period for which he was elected or appoint-

ed: Provided, That all officers within this state shall continue to perform the duties of their offices until their successors shall be duly qualified."

If it be assumed that the only reason for the placing of this provision in our Constitution was to make secure to the public officials of this state the receipt of the salary fixed at the time of their election, then the suggestion of the withholding of the writ by this court would be entitled to the serious consideration of this court, but this assumption overlooks the history of the reasons for the insertion of this and similar provisions in the Constitutions of practically all of the states and the Constitution of the United States. As applied to the judicial department, the history of such provisions shows clearly that they were inserted in the various Constitutions for the purpose of making absolutely independent the judicial branch of the government, and while the language employed in the various Constitutions varies somewhat, the evident purpose expressed in each is the continuation of separate and independent branches of government.

It is a matter of judicial history that one of the abuses of the power of the King of England that resulted in the Revolution of 1688 was the abuse that followed the power of appointing and removing at will the judges. To appreciate the evils that flowed from a dependent judiciary we may well consult the experience of England as shown by their judicial history and experience during the Stuart Dynasty, when the judges held office at the pleasure of the King who appointed them, and when they depended entirely upon the generosity of the appointing power for their compensation and the amount thereof, which resulted in the judges becoming but tools of the Crown, who made and unmade them. Scroggs and Jeffrey are but representative of such a system. Whole benches were appointed for the distinct purpose of carrying into effect some new or flagrant assumption of power by the Crown, and they willingly obeyed the commands of the master and creator. Outraged by such a judicial subservience that followed a dependent judiciary, following the Revolution, the people made the tenure of the judges good behaviour, and this was proclaimed by the people of England as a triumph of liberty, and changed the exercise and enjoyment of the inalienable rights of the people of England from an abstract right to one of complete enjoyment. It may well be said that this change of the tenure of judges in England marked the creation and beginning of an independent

judiciary, and that as years have passed the people of England and all other countries have learned the value and necessity of an independent judiciary and have in their Constitutions and laws endeavored to provide for a continuation of the same. It is significant that in the enumeration of the wrongs suffered at the hands of the King, the Declaration of Independence recites that he, the King, had "made judges dependent on his will alone for the tenure of their offices and the amount and payment of their salaries."

The Constitution of the United States, after providing for three separate and distinct branches of the government therein created and set up, in article 3, sec. 1, provided:

"The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the Supreme and inferior Courts, shall hold their offices during good behaviour, and shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance in office."

It will be observed that the difference between the limitations as to the changing of compensation contained in the above-quoted section and the limitations contained in our Constitution is that the limitations imposed in the Constitution of the United States go only to diminution of compensation, while the limitations contained in our Constitution prevent the compensation being either diminished or increased. It is only necessary to look to the proceedings of the convention which framed the Constitution of the United States to determine the reasons underlying the incorporation in that Constitution of the quoted clause, and that same was not included for the purpose of making secure to the justices and judges constituting the judicial branch of that government the exact amount of salary that was payable to such justices or judges at the time they took office, but that the controlling thought and purpose in inserting such provision was to create to these people of the United States an independent judiciary. As was said by the Supreme Court of the United States in the case of Evans v. Gore, 253 U. S. 245, 64 L. Ed. 887, and at pages 248 and 249 of said decision:

"These considerations make it very plain, as we think, that the primary purpose of the prohibition against diminution was not to benefit the judges, but, like the clause in respect of tenure, to attract good and com-

petent men to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations, and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest; in other words, not restrictively, but in accord with its spirit and the principle on which it proceeds.

"Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive, as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle." .

In other words, the members of the convention that framed the Constitution of the United States, being men of profound learning, ripe wisdom, possessed of a high spirit of liberty and a love of constitutional government, realized that when courts ceased to be independent, the Constitution will cease to be supreme, and that if the Constitution does not maintain the courts independent of the legislative and executive branches, the courts cannot maintain the Constitution against these branches, and to make secure the independence of the judicial department the quoted clause was inserted.

In a very recent case the Supreme Court of the United States had occasion to go into and review again the underlying purpose which the framers of the Constitution of the United States had in mind and which led them to incorporate in that document the limitation prohibiting the diminishing of the salary or compensation of the justices and judges of the judicial system created by the Constitution, and we refer to the case of O'Donoghue v. United States, 77 L. Ed. 950. In that opinion Mr. Justice Sutherland, speaking for the court, makes an able and exhaustive review of the history of this provision and the cases construing same, and reaches the conclusion that the paramount object to be obtained in the adoption of the quoted clause was the maintenance of an absolutely independent judiciary in these United States so that their acts should not be controlled by or subjected directly or indirectly to the coercive influence of either of the other departments of government, and such has been the uniform holding of every court whose decisions we have read, or to whose decisions

we have been invited, in construing similar provisions in the various state Constitutions.

Mr. Justice Sutherland, in stressing the importance of maintaining an independent judiciary in the above case, used the following language:

"In the light of the foregoing views—time honored and never discredited—it is not extravagant to say that there rests upon every federal judge affected nothing less than a duty to withstand any attempt, directly or indirectly in contravention of the Constitution, to diminish this compensation, not for his private advantage—which, if that were all, he might willingly forego—but in the interest of preserving unimpaired an essential safeguard adopted as a continuing guaranty of an independent judicial administration for the benefit of the whole people."

Our constitutional convention was composed of many learned men, some of whom were profound lawyers and who were entirely familiar with the history of the reasons prompting the insertion in the Constitution of the United States and various state Constitutions of similar provisions, and we do not hesitate to say that the underlying principle of government sought to be protected and made permanent was the complete independence of the three branches of government provided for in the Constitution. As we have heretofore stated, the limitation contained in our Constitution goes further than that contained in the Constitution of the United States and many of the state Constitutions, our Constitution providing, "In no case shall the salary or emoluments of any public official be changed after his election or appointment. * * *" As will be seen from this, the framers of the Constitution sought to make more secure the independence of the judiciary in this state, and to remove them from any possible influence the legislative branch of the government might have over the judicial by reason of a power to increase their compensation or salary during their tenure of office. In other words, that the courts of this state need withhold no decision dealing with the power of either of the other departments through fear of retaliation by a reduction in their salaries, nor need they grant an opinion through the hope of a reward by the granting of an increased salary. And so, in answer to the suggestion that this court should take judicial notice of present economic conditions in determining what exercise we shall make of our discretion in this case, we say that when we are presented with a course of conduct by one branch of the government

of this state which tends to destroy the independence of the other branches, and the continuation of which, if sanctioned by this court, will result in the establishment in this state of a dependent judiciary, we will not hesitate to declare the law as we find it and will issue such writs or process as may be necessary to continue in this state its Constitution as the supreme law and command obedience thereto, for, as was said by Chief Justice Marshall during the course of the debates of the Virginia State Convention of 1829-30:

"The judicial department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? * * * I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people was an ignorant, a corrupt, or a dependent judiciary."

As to the second proposition, it is only necessary to say that this court has always recognized that the raising of revenue and the appropriation of same is a prerogative vested solely in the legislative branch of the government, and most certainly this court does not, nor does any other court so far as we have been able to find, assert that the judicial department has any control over the legislative branch of the government so long as they act with due regard to the commands and limitations contained in the Constitution. This court has no power to make appropriations or to add to or take from appropriations made by the Legislature in a constitutional manner, and our inquiry is, therefore, of necessity limited to determining whether an appropriation has been made, and in the making of same whether any constitutional limitation has been violated. We do not understand the petitioner contends that we possess either the power to make appropriations or to disturb appropriations once lawfully made. Recognizing this principle, then, in a determination of the question before us, we must determine if an appropriation has in fact been made, and, if none has been made, deny the petitioner the relief sought.

In a discussion and determination of this question it is necessary that we first look to the Constitution and various acts of the Legislature which are asserted by the respondents to sustain and justify their course in refusing to issue, or pay, if issued, a warrant in the sum to which under the statute fixing his compensation the petitioner would be entitled. Section 55, art. 5 of our Constitution provides as follows:

"No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

Section 3568, O. S. 1931, provides as follows:

"It shall be unlawful for the State Auditor to issue or draw any warrant in disbursement of the Public Building Fund, Section 13 Funds, New College Funds, Game Protection Fund, General Revenue Fund, or any other state fund or fund under the management of the state, except in pursuance of an appropriation act in which the amount appropriated shall be distinctly specified and stated. Provided, no warrant shall be issued by the State Auditor in disbursement of any moneys appropriated out of any of the funds above mentioned after two and one-half years from the date of the passage of any such appropriation act. And provided, further, that in the event the issue by the Auditor of any warrant without an appropriation having been first provided for such purpose by the Legislature, or in excess of the amount appropriated, the same shall not be a charge against the state or paid from its funds, but shall be a charge against the Auditor and his bondsmen."

From a reading of the quoted sections, it will be seen that the Constitution prohibits any money being paid out of the state treasury except in pursuance of an appropriation "by law." It is significant that the framers of our Constitution used the language "by law," rather than an appropriation "by the Legislature," as is provided in the Constitutions of many of the states. The quoted section of the statute makes workable this section of the Constitution, and prohibits and makes unlawful the issuing of any warrant in disbursement of any state fund or funds in the possession of, or under the management of, the state, except in pursuance of an appropriation. The language of these sections is so plain that it admits of but one construction, and that is that no funds shall be withdrawn from the state treasury, nor shall any warrant be issued or drawn against any moneys

in the state treasury, except in pursuance of an appropriation by law, and therefore, unless there has been an appropriation made by law authorizing the payment of the salary of the petitioner, and in the sum of $625 per month, clearly the State Auditor could not draw or issue a warrant for this amount in payment of the July, 1933, salary of petitioner, and if said warrant were issued, the State Treasurer could not pay same, because the law specifically prohibits the issuing of a warrant by the State Auditor, or the payment of a warrant if issued by the State Treasurer, unless an appropriation by law has been made to pay same; and, therefore, we next inquire: (1) What constitutes an appropriation "by law" as provided for in our Constitution? and (2) has an appropriation "by law" been made to pay the salary of the petitioner at the rate of $7,500 per year and at the rate of $625 per month?

This state is committed to the rule that no particular words need be used in making an appropriation, and that an appropriation may be implied where the language used reasonably leads to the conclusion that such was the intention in the employment of those words. Menefee, State Treasurer, v. Askew, State Game and Fish Warden, 25 Okla. 623, 107 P. 159; Edwards v. Childers, State Auditor, 102 Okla. 158, 228 P. 472. It being admitted by the petitioner that the Legislature has not made an appropriation in an amount that will, for the fiscal years ending June 30, 1934, and June 30, 1935, provide the full salary the petitioner is entitled to receive, if an appropriation has been made to pay said full salary, we must look to the Constitution to find same. The section of our Constitution providing for the withdrawal of moneys from the state treasury only in pursuance of an appropriation "by law" clearly means that an appropriation may be contained in the Constitution itself, for the proposition that the Constitution of a state constitutes one of the laws of the state, we think, can be no longer doubted. Mississippi & M. R. Co. v. McClure, 77 U. S. (10 Wall.) 515, 19 L. Ed. 998; White v. Hart, 13 Wall. 652, 20 L. Ed. 687; New Orleans Gaslight Co. v. Louisiana Light, etc., Co., 115 U. S. 672, 29 L. Ed. 524.

At the time of the framing of our Constitution, there were many states whose Constitutions contained the same or similar provisions. The phrase there used, "except in pursuance of an appropriation made by law," had long since received a definite and fixed interpretation. The leading case,

Thomas v. Owens, 4 Md. 189, was written in 1853. In 1890 the Supreme Court of Montana, in the case of State ex rel. Rotwitt v. Hickman, 9 Mont. 370, 23 P. 740, 8 L. R. A. 403, when called upon for construction of constitutional provisions very similar to those of our Constitution, in a case involving practically the same questions, delivered an able and exhaustive opinion. It cannot be supposed that the able framers of our Constitution were uninformed on this score, since these cases were, in subsequent decisions of this court, specifically referred to by members of the court who had personally assisted in the drafting of the Constitution. In the Montana case, Rotwitt sought a mandamus against Hickman, State Treasurer, to compel him to pay a warrant held by Rotwitt for his salary as Secretary of State. Hickman defended upon the ground that the Legislature had failed to make an appropriation out of which the payment could be made. Since the opinion of the Montana court is remarkably lucid and exhaustive and states with superb clarity the argument for the existence of a constitutional appropriation in this case, we quote from it at length:

"There is no statute which makes an appropriation or otherwise provides for the payment of this warrant, and the sole question for decision depends upon the interpretation of the following clauses of the Constitution: 'Until otherwise provided by law, the Governor, Secretary of State, State Auditor, Treasurer, Attorney General, and Superintendent of Public Instruction, shall quarterly, as due, during their continuance in office, receive for their services compensation, which is fixed as follows: * * * Secretary of State, $3,000 per annum. * * * The compensation enumerated shall be in full for all services by said officers respectively rendered in any official capacity or employment whatever during their respective terms of office, and the salary of no official shall be increased during his term of office. No officer named in this section shall receive for the performance of any official duty any fee for his own use. * * *' Article 7, sec. 4.

" 'Except as otherwise provided in this Constitution, no law shall extend the term of any public officer, or increase or diminish his salary or emolument after his election. * * *' Article 5, sec. 31. * * *

" 'The State Auditor and State Treasurer shall perform such duties as are prescribed in this Constitution and by the laws of the state.' Article 7, sec. 1. * * *

"What, then, are 'appropriations made by law?' A majority of the states of the American Union have not adopted Constitutions which specify the salaries that should be paid to their officers. Numerous

cases can be found in their courts which determine the necessity of an appropriation by the law-making department before the payment of money can be authorized by the custodian of the public funds. But the fundamental law of this state constitutes an exception in this important feature, and the decisions of such courts do not enlighten us. All the adjudications which construe constitutional phrases similar to those of Montana concur in their declaration of principles.

"The leading case is that of Thomas v. Owens, 4 Md. 189, which was decided in 1853 by the Court of Appeals, and the opinion was delivered by the profound jurist, Chief Justice LeGrand, after a thorough examination. Thomas was the Comptroller of the State, and applied for a writ of mandamus to be directed to Owens, the State Treasurer, commanding him to pay the amount of a draft drawn in payment of his salary. Owens refused payment on several grounds, including the following: 'That no sufficient appropriation has been made by law specifying a sum applicable to the payment of the amount claimed by the petitioner.' The gravity of the investigation, and the lucid reasoning of the court, induce us to be liberal in the use of excerpts. The inquiry, then, is, Is there an appropriation for the period intervening between the 10th of December, 1851,—the time from which we think he is entitled to pay,—and the 1st day of January, 1852? We are of the opinion the Constitution, We are of opinion the C o n s t i t u t i o n, Under our system of government, its powers are wisely distributed to different departments. Each and all are subordinate to the Constitution, which creates and defines their limits. Whatever it commands is the supreme and uncontrollable law of the land. This is not denied directly, although it is inferentially, substantially, and practically. It is said that, inasmuch as the 20th section of the 3d article of the Constitution declares, "No money shall be drawn from the treasury of the state except in accordance with an appropriation made by law," that an act of Assembly must precede the withdrawal; and inasmuch as none such has been passed covering the period antecedent to the 1st of January, 1852, there is therefore no appropriation by law for that time. To this reasoning we cannot yield our consent. In the construction of any instrument, the whole paper ought to be considered, that the will of its framers may be truly and accurately ascertained. The objects contemplated, and the purposes to be subserved, should be constantly kept in view, and the language used interpreted in reference to the manifest intent. Now, what could have been the purpose of the clause in the Constitution to which we have referred? It was obviously inserted to prevent the expenditure of the people's treasure without their consent, either as expressed by themselves in

the organic law, or by their representatives in constitutional acts of legislation.' * * *

"In assigning the powers of government to three different departments, the Constitution intended to secure to each its independency of action; and, the more certainly and effectually to insure this, it has ascertained and appropriated the salary they are severally to receive, and it has inhibited the Legislature from diminishing it. Were it not for such a provision, the whole government would exist only by permission of the Legislature. It can only be carried on through the instrumentality of individuals, and their services can only be obtained by being paid for. The framers of the Constitution, and the people who adopted it, aware of this, determined not to submit the durability of their work to the caprice, passion or prejudice which possibly might, at times of great excitement, triumphantly rule the action of the Legislature, and therefore wisely did the work themselves, by ingrafting in the organic law a provision for the protection of those who should be charged with its execution. In other words, they made the appropriation. An opposite interpretation would countenance this paradox; that a co-ordinate branch of the government could stop its whole machinery, by refusing to pay the salaries of those upon whom is devolved the discharge of the duties of the other branches; and this, too, when the Constitution expressly declares that these officers 'shall receive' their salaries, and that they 'shall not be diminished.' 'It would be giving to the Legislature a practical and real omnipotence with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.' Marbury v. Madison 1 Cranch [5 U. S.] 137, 178 [2 L. Ed. 60, 73]. Now, it is presumed it would not be contended by anyone, however hazardous, that if the Legislature were to pass an act diminishing the salary of the Governor, or of any other officer whose salary is fixed by the Constitution, that such an exercise of power would be rightful and constitutional. If it be not competent to the Legislature to take away a part, by what process of reasoning can it be maintained that they can take away the whole? And yet this is the extent to which the argument addressed to us goes. It seems to us to be but necessary to state the proposition to cause its instantaneous rejection. We hold, for the reasons we have assigned, the people have given their consent to the payment of the salaries fixed in the Constitution, by declaring the amount 'shall' be 'received' by the particular officer; and that this is an appropriation by law,—by the supreme law of the state.

"The case of Thomas v. Owens, supra, is commented on in Green v. Purnell, 12 Md. 333, and the court said: 'There, the petition asked for a mandamus requiring the

treasurer of the state to pay the Comptroller, upon his warrant, the amount of his salary, whch is regulated by the Constitution, and, of course, duly appropriated by law.'

"In State v. Weston, 4 Neb. 216, the 'case raises the question of the authority of the State Auditor to draw warrants upon the State Treasurer for the payment of the salaries of the state officers when no appropriation therefor has been made by the Legislature.' The Constitution of that state provides that 'no money shall be drawn from the treasury except in pursuance of a specific appropriation made by law.' If this clause,' says Chief Justice Lake, 'had limited the appropriation which it requires to an act of the Legislature, there might be some force in the objection urged. But, it only requires a specific appropriation "made by law," and we are clearly of the opinion that this may be accomplished just as effectually by the Constitution as by legislative enactment.' The court further says: 'In the case of Reynolds v. Taylor, 43 Ala. 420, it was held that if the salary of a public officer is fixed, and the times of payment prescribed, by law, no special annual appropriation is necessary to authorize the auditor to draw his warrant for its payment. But the case of Thomas v. Owens, 4 Md. 189, seems to be more directly in point. It was there held that when the Constitution declared the amount to be paid an officer, that it was an appropriation made by law, and no legislative act was necessary.'

"In State v. Weston, 6 Neb. 16, the court explains the decision in State v. Weston, supra, and asserts that 'it reaches only those officers who hold by virtue of the Constitution itself, and not to those who hold their offices at the will of the Legislature'; and the 'appropriation made by law * * * may be done either by direction of the Constitution itself—that being the supreme law in the state—or by the Legislature.'

"We do not know of any rule to the contrary where the same constitutional provisions exist which are embodied in the supreme law of this state. An illustration of the principles which are applied where salaries of the officers are not prescribed by the Constitution, and the case of Thomas v. Owens, supra, is not followed, may be found in Myers v. English, 9 Cal. 348. This was an application for a writ of mandamus to compel the State Treasurer to pay certain warrants drawn by the Comptroller on account of the salary of a district judge. The Constitution provided that the judges of the district court shall severally, at stated times during their continuation in office, receive for their services a compensation, to be paid out of the treasury, which shall not be increased or diminished during the term for which they shall have been elected. Article 6. sec. 15.

"Another clause is the following: 'No money shall be drawn from the treasury but in consequence of appropriations made by law.' Article 4, sec. 23.

"It was correctly held by the court that it was necessary for the Legislature to define the amount of the salary, and make an appropriation for the payment thereof, before this remedy could be enforced. This view of the Constitution of a state has been adopted by the Supreme Court of the United States, in construing the clause of the federal Constitution which declares that no state shall pass any 'law impairing the obligation of contracts.'

"Mr. Justice Swayne in Mississippi & M. R. Co. v. McClure, 77 U. S. (10 Wall.) 515 (19 L. Ed. 998), asserts that 'the Constitution of a state is undoubtedly a law, within the meaning of this prohibition.' * * *

"We cannot add anything to the discussion of this vital proposition. The doctrines which were announced in Thomas v. Owens, supra, have been accepted for years without a question, and have remained inflexible under every test. The framers of the Constitution of this state numbered upon their roll most eminent jurists and lawyers. They studied with wisdom and ability the charters which the people had granted to the states of the Union, in their efforts to obtain the best articles from all. They knew the precedents which have been enumerated, and the canons of interpretation which had been formulated by the courts, and deliberately created the sections of the Constitution which fix the salaries of many state officers." State of Montana ex rel. Rotwitt v. Hickman, 9 Mont. 370, 23 P. 740, 8 L. R. A. 403-405.

The existence of the rule has been recognized by this court. In the case of Menefee v. Askew, 25 Okla. 623, 107 P. 159, Williams, J., speaking for the court, said:

"The following authorities support the contention that, where a constitutional provision fixes salaries of officers with a limitation, same neither to be changed nor increased during the term to which such officer was appointed or elected, and a definite time being fixed by the Constitution or statute for the payment of such officer, such provisions proprio vigore constitute an appropriation out of the treasury * * * as the same becomes due: Thomas v Owens, 4 Md. 189; State v. Hickman, 9 Mont. 370, 23 P. 740, 8 L. R. A. 403; State v. Kenney, 10 Mont. 485, 26 P. 197; State v. Weston, 4 Neb. 216; State v. Weston, 6 Neb. 16; State v. Burdick, 4 Wyo. 272, 33 P. 125, 24 L. R. A. 266; People v. Goodykoontz, 22 Colo. 507, 45 P. 414. And some authorities go to the extent that such is the effect when the office is created by statute and the salary and time of payment also fixed thereby. (Citing cases).

"The foregoing rule is criticized and not

followed in the cases of Myers v. English, 9 Cal. 341; Pickle v. Finley, 91 Tex. 484, 44 S. W. 480; Shattuck v. Kincaid, 31 Ore. 379, 49 P. 758; Kingsbury v. Anderson, 5 Idaho, 771, 51 P. 744."

And quoted liberally from the case of Pickle v. Finley, supra. It is contended that Menefee v. Askew, supra, is a denial of the rule with respect to constitutional officers. Not so. In that case the court dealt with an officer **created by the Legislature,** to wit, the State Game Warden, **not with a constitutional officer and not with a constitutional provision for compensation.** The court, moreover, held that the act creating the office, providing for the salaries of the officers named, and the times and manner of their payment, was an appropriation by law, and that such appropriation was limited only by the two and one-half year provision of section 55, art. 5, of the Constitution. The court based its holding as to the limitation in part on the reasoning found in Pickle v. Finley, supra, and to that extent only can the Texas case be said to have approval. The salary or emoluments of a constitutonal officer were not involved and no constitutional provision respecting the same was under consideration. It cannot be said that the court departed from the issues involved to commit this state to a rejection of the rule as applied to constitutional officers when no such matters were then before the court for decision. The case of Pickle v. Finley, supra, also dealt with an office created by the **Legislature** and not with a **constitutional** officer. Let it be here noted that the Texas Constitution carries no such provision as section 10, art. 23, but that a provision to that effect is found in the Texas statutory law. Revised Civil Statutes, 1911, tit. 120, ch .5. art. 7086. Further, the Supreme Court of Texas in the case of Lightfoot v. Lane, 140 S. W. 89, calls particular attention to the fact that the Pickle Case did not involve a constitutional officer and, for that reason, was not authority in a case which did involve one.

The case of Myers v. English, supra, often cited as contrary to the rule announced in the Hickman Case, is harmonized with the rule by the court in State v. Hickman, supra, and in the more recent case of Humbert v. Dunn, 84 Cal. 57, 24 P. 111, the California court seems not to follow in all strictness the Myers Case. The case of Kingsbury v. Anderson, supra, deals with a statutory provision empowering the State Auditor to employ counsel, and providing that the expenses of such employment must be paid out of the territorial treasury. Here again

a constitutional officer and his compensation are not involved, and when the Idaho court deals with a **constitutional officer** in the case of Reed v. Huston, 24 Idaho, 26, 132 P. 109, Ann. Cas. 1915A, 1237, it approves the rule stated in State v. Hickman, supra, and cites that case as authority. In the Oregon case cited, Shattuck v. Kincaid, supra, the salaries of judges of the circuit courts were involved. The salaries of these officers were fixed by statute stating the amount and times of payment. Upon a mandamus against the Secretary of State to compel payment, that officer interposed the plea that no appropriation had been made by the Legislature. The court denied the plea and directed the mandamus to issue. In the opinion the court said:

"It is maintained by some authorities that constitutional provisions fixing the salaries of state officers proprio vigore make an appropriation out of the treasury for the payment of the same as they become due, and this upon the ground that such salaries have become fixed and unchangeable by any power vested in the Legislature, and that to withhold the funds necessary to their payment would be subversive of the will of the people as expressed by the organic law. It is said, arguendo, that if the Legislature is without power to reduce the salaries of such officers, it cannot be affirmed that it may take away the whole by withholding the funds requisite to their payment. In support of this view Thomas v. Owens, 4 Md. 189, * * * is perhaps the leading case. It has been followed in State v. Hickman, supra. * * * Other cases apply the principle to legislation under Constitutions which provide that salaries of state officers shall neither be increased nor diminished during the terms for which they shall have been appointed or elected. It is maintained by these that the law fixing such salaries becomes immutable in so far as it may affect incumbents, and that the Legislature is powerless to cut off by indirection that which it could not do by direct enactment, and hence, that a statute merely fixing the amount to be received and the times of payment is, in effect, an appropriation of funds which become applicable to the discharge of their stated compensation as it becomes due. And we may say the very decided tendency of recent adjudications is in support of this advancement upon the doctrine."

And upon this matter, after some further discussion, the court said:

"Whatever may be the correct rule, where the salary is fixed by the Constitution, or where it is by that instrument rendered unchangeable during incumbency, followed by legislation simply fixing the amount and times of payment thereof, it is quite certain that, if regard be paid to the known

and well-settled rules of **statutory** construction, the Legislature has not, by the enactment of such a statute, **without else,** manifested an intention of setting aside funds in the treasury for its payment." (Emphasis ours.)

So, in our opinion, the Oregon court has refused to state, in that decision, what the correct rule is where the salary is fixed by the Constitution, or where it is by that instrument rendered unchangeable during incumbency, followed by legislation simply fixing the amount and times of payment. Suffice it to say that the court did direct the writ to issue commanding the defendant to draw the warrant in that case. From this examination of the cases cited in Menefee v. Askew, supra, we think it is clear that it was not intended in that case to deny any such rule as applied to constitutional officers and their compensation.

Further recognition of the rule as applied to constitutional officers is given in Meyer v. Clift, 31 Okla. 793, 123 P. 1042, where Hayes, J., speaking for the court. said:

"The facts of this case do not bring it within the rule of the class of cases holding that, where an office is created and its salary fixed by a constitutional provision no appropriation by legislative act is necessary to authorize the payment of the salary, to which belong the following: Thomas v. Owens, 4 Md. 189, State v. Hickman, 9 Mont. 370, 23 P. 740, 8 L. R. A. 403; State v. Weston, 4 Neb 216 The Constitution contains no provision creating the position of court stenographer. Such office exists and its salary is fixed by virtue of a legislative act."

The authors of the opinions in Menefee v. Askew, supra, and Meyer v. Clift, supra, were members of the Constitutional Convention, and the opinions were filed but a short time after the adoption of the Constitution. For these reasons, the opinions are rightfully entitled to great weight in the construction of constitutional provisions, but, to my mind, neither of them is susceptible of the construction sought to be placed upon them, that of denying the rule announced in Thomas v. Owens, supra.

It is said that the limitation of two and one-half years for the expenditure of appropriations contained in section 55, art. 5, Constitution, must be applied even though it be held that there exists a constitutional appropriation. That does not appear to be the rule. At the time of the rendition of State v. Hickman, supra, the Constitution of Montana contained a two-year limitation upon such expenditures "No appropriations of public moneys shall be made for a longer

term than two years." Section 12, art. 12, Const. 1889.

And the Constitution of Nebraska (art. 3, sec. 22) contained the following provision:

"Each Legislature shall make appropriations for the expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular session, and all appropriations shall end with such fiscal quarter."

The rule is stated in 59 C. J. 259, as follows:

"Constitutional time limits on the life of appropriations do not apply to such appropriations as are made by the Constitution itself, even though the amount of the appropriation is fixed by statute; nor to such appropriations as are expressly authorized and vested with a peculiar status and character by the Constitution."

Supporting this text are cited the cases of Weston v. Herdman, 64 Neb. 24, 89 N. W. 384, and City of Aransas Pass v. Keeling, 112 Tex. 339, 247 S. W. 818. Further support to this rule is found in the cases of Dickinson v. Edmondson, 120 Ark. 80, 178 S. W. 930, Ann. Cas. 1917C, 913, and Borden v. Board of Education, 168 La. 1005, 123 So. 655, 67 A. L. R. 1183. These cases seem to proceed upon the theory that the constitutional provisions under discussion are self-executing. And see Anderson v. Whatcom County (Wash.) 45 P. 665. It can hardly be questioned that the provisions of section 10, art. 23, of our Constitution are self-executing.

"A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced." Cooley, Const. Lim. (7th Ed.) 121.

That authority gives as an example of self-executing provisions the 15th Amendment to the Constitution of the United States:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color, or previous condition of servitude."

It cannot be denied that had the Legislature attempted to increase the salary of relator during his term of office, section 10, art. 23, would have effectually prevented the payment of such an increase at the suit of any taxpayer without the necessity of supplemental legislation. If the provision is self-executing as to an unconstitutional increase of compensation, can a simi-

lar status be denied it as to the proposed unconstitutional decrease?

It may be said that provision for salaries of Justices of the Supreme Court being fixed by a provision of the Schedule, it is not properly a part of the Constitution. We deem the case of State v. Carter, 77 Okla. 28, 186 P. 454, a sufficient answer. It is clear that the framers of the Constitution intended that the constitutional officers named in sections 15 and 16, art. 25 (Schedule), receive compensation for their services; that such compensation should be and remain in the amounts therein stated until changed by the Legislature; that the authority given the Legislature was solely and only that of varying the amount of such compensation within the limits of section 10, art. 23. (State v. Carter, supra.) That intention is brought into strong relief by section 17, art. 25, which leaves entirely to legislative discretion the compensation of the constitutional officers there named. Bohart v. Anderson, 24 Okla. 82, 103 P. 742, Ann. Cas. 142.

The Constitution, constituting the paramount law of this state, delegated to the Legislature the exclusive power to make appropriations, and it would be asserting an absurdity to state that the people by their Constitution made a valid delegation of a power that they themselves did not possess. Clearly the people had the right to make an appropriation in the Constitution. It is true that Justice Williams, speaking for the court, in the case of Menefee v. Askew, supra, in defining an appropriation used the language, "an appropriation in this state is an authority of the Legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum. from a designated fund out of the treasury in a given year, for a specified object or demand against the state," but clearly he did not intend to say that no appropriation could be made in this state except by the Legislature. It is an established rule of construction that language used in a judicial opinion is to be interpreted in the light of the facts with which the court was dealing. As was said by Chief Justice Marshall, in Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, "General expressions in every opinion are to be taken in connection with the case in which those expressions are used." In using the language in the Menefee Case, the court had before it the question as to whether the language used in an act of the Legislature constituted an appropriation, and the only question before the court at the time the quoted language was used by Jus-

tice Williams was, Does the language used in an act of the Legislature constitute an appropriation? and he was in no manner discussing or deciding the question as to whether words used in the Constitution could constitute an appropriation. This is made clear by an opinion of this court rendered shortly thereafter, this opinion also being written by Justice Williams. We refer to the case of Betts v. Commissioner of the Land Office, 27 Okla. 64, 110 P. 766. One of the questions in that case was the authority of the Commissioners of the Land Office to withdraw from the state treasury funds derived from the leasing of school lands for the purpose of investment in the absence of an appropriation having first been made by the Legislature. In discussing this question, at page 81 of said opinion, it is said:

"Section 6 of article 11 of the Constitution constitutes a continuing appropriation of the common school fund and other educational funds for the purposes of investment and reinvestment."

Clearly this language is susceptible of but one construction, and that is, that an appropriation may be made in the Constitution, and that appropriations contained in the Constitution may be continuing even though the Legislature be prohibited from making continuing appropriations. Limitations contained in a Constitution are denying to the delegated authority the right to use the full power possessed by the people in their sovereign capacity, and by what line of reasoning can it be said that it is sought to limit the exercise of a power conferred when the conferring body itself possessed no such power? In the case last above quoted, this court further held that the interest and income of the permanent school fund, the net income from the leasing of lands for the use and benefit of the common schools, might be apportioned among the several common school districts of the state and paid out of the state treasury to such districts without any specific appropriation having been made by the Legislature, section 3, article 11, of the Constitution authorizing such to be done. In other words, that section 3, article 11, of the Constitution is an appropriation made "by law" as required by section 55, art. 5, of the Constitution, and that the appropriation so made by section 3 is a continuing appropriation.

It must further be borne in mind that this particular section of the Constitution was taken from the Constitution of Alabama, and as early as 1833, in the case of Nichols v. Comptroller, 4 Stew. & P. 154, the Supreme Court of Alabama held:

"In order to authorize the Comptroller to issue his warrant on the treasury for the amount of a salary, it is not necessary that there should be a special annual appropriation by act of the Legislature, where there is a general law, fixing the amount of the salary and prescribing its payment at particular periods."

And later, in 1869 the Supreme Court of Alabama again had before it the same question in the case of Reynolds, Auditor, v. Taylor, 43 Ala. 420, and in said case used the following language:

"He insists that the application of appellee should be denied, because it is not shown that an appropriation had been made to pay his salary, as marshal, etc., at the sum claimed by him; but that appropriations had been made to pay him one thousand dollars salary per annum only, and not two thousand dollars as claimed. We know that the general appropriation acts of 1866 and 1867, appropriated one thousand dollars only, for the payment of the salary of the marshal of the Supreme Court. This objection is sufficiently answered, by a decision of this court made more than thirty years ago. In the case of Nichols v. The Comptroller, 4 Stewart & Porter, 154, it is decided, that in order to authorize the Comptroller to issue his warrant on the treasury, for the amount of a salary, it is not necessary that there should be a special annual appropriation by act of the Legislature, where there is a general law fixing the amount of the salary, and prescribing its payment at particular periods.

"We are not aware that this decision has been doubted from that day to the present time. * * *"

Surely the framers of our Constitution were entirely familiar with this construction which had been placed upon the Constitution of Alabama as early as 1833, and it must be presumed that they adopted same in the light of this construction. It is true that the Constitution of Alabama did not contain the limitation as to the expenditure of the appropriations within a given time, but it does settle the question in that state that appropriations may be made in the Constitution, and it must be presumed by this court that the framers of the Constitution adopted this section from Alabama together with this settled construction thereof by the courts of Alabama, and clearly the cited cases from this court fully establish the rule, in this state, that an appropriation may be made in the Constitution, and that when same is so made it is not subject to the limitation contained in section 55, art. 5, of the Constitution, that "nor unless such payment be made within two and one-half years after the passage of such appropriation act," and that this limitation applies only to appropriations made by the Legislature.

With these established principles in mind, we now pass to the question, Does the Constitution make an appropriation to pay the salary of petitioner? In determining this question it is necessary that we look to those provisions contained in the Constitution fixing the salary of the Justices of this court, and making provision for the payment of same. Section 15, art. 25 (Schedule), of the Constitution provides:

"Until otherwise provided by law, the officers of the state shall receive annually, as compensation for their services, the following sums: * * *"

This section, then, provides the salaries of various state officers. Section 16 of article 25 of the Constitution provides:

"The salary of the Justices of the Supreme Court of the state shall be four thousand dollars per annum, each. and that of the judges of the district court, three thousand dollars per annum, each, until changed by the Legislature."

From these two sections it is seen that the Constitution fixes, until changed by the Legislature, the salary of the Justices of this court, and provides that they **shall receive same.** Pursuant to the authority granted by the Constitution, the Legislature changed the salaries of the Justices of this court by chapter 273, S. L. 1929, p. 396, fixing the salary at $7,500 per year, payable monthly, and in now considering the words in the Constitution, we are to read the same as if the salary fixed by the Constitution was the sum of $7,500 per year, payable monthly, for the authorized acts of the Legislature as much express the will of the people as their expression as contained in the Constitution.

In construing the language used in the Constitution, we must consider the entire Constitution, the objects contemplated by its mandates, and the evils sought to be avoided by its limitations, and the language used given such construction, if possible, as will make effective the entire Constitution and carry out the manifest intention of the framers of the same and the people who adopted it. We have heretofore discussed the clearly manifest intention of the framers of our Constitution prohibiting the changing of the salary or emolument of a state officer during the tenure of his office, and the reasons leading to the inclusion in our Constitution of that section limiting the withdrawal of state funds from the state treasury except in pursuance of an appro-

priation by law are too well known to require any extended discussion thereof. This court, in the case of Edwards v. Childers, 102 Okla. 158, 228 P. 472, reviews this question at length, and we think it may be said that the purpose of this provision in our Constitution was to prevent the withdrawal of the public funds from the state treasury except in pursuance of the **expressed will of the people.** This will may be expressed in the Constitution itself, or through the legislative branch of our government. Bearing in mind that our government consists of three separate and distinct departments, and that there is prohibited in the Constitution commingling of these essential parts of government in the same hands, each department is an exclusive trustee of the power vested in it and accountable to the people alone for the manner in which they exercise this power, and in the exercise of which they shall never be controlled by or subject to a coercive influence of either of the other departments, and while the three branches of government are co-ordinate in that sense that they each co-operate in the working of this government and the maintenance of a government according to the forms prescribed in the Constitution, yet each is entirely independent of the other in that sense that the judgment of each is to be exercised entirely independently of the influence of the other departments. Each is supreme in its own field, subject only to the limitations and commands imposed in the document creating them, and any language employed by the framers of our Constitution was most certainly used in an effort to keep inviolate the independence of the three branches of the government provided for, so that one might be a check upon the other. Bearing in mind these views, and the settled rules of construction applicable, Was it contemplated by the framers of our Constitution that power should exist in the legislative branch to strike down and make impotent the judicial branch of our government by simply withholding its appropriation? Was it intended by the framers of our Constitution to vest power in the legislative branch of our government to make dependent the judicial branch by doing indirectly that which they were prohibited from doing directly, that is, power to reduce the compensation of the judges by withholding its appropriation for their salaries, or by appropriating an amount less than the Constitution, or the Legislature, in the exercise of the right conferred by the Constitution, had said they should receive during their tenure of office? We do not hesitate to say that the language used by the

framers of our Constitution was used with the intention that neither of the above conditions should exist, and we assert that it was the intention of the framers of the Constitution to make impossible and prohibit the existence of either of these conditions. To hold otherwise would be to say that the framers of our Constitution intended to provide a system of government composed of three separate and independent branches, and in the same breath, so to speak, vest power in the legislative branch to destroy or make dependent the other two branches. Government can function only through individuals, and the services of individuals can only be obtained by paying for their services, and most surely it was never intended by the framers of our Constitution to vest power in the Legislature to create a condition where only those who possess sufficient moneys to forego the payment of their salary could administer the affairs of this state. To admit that the framers of our Constitution and the people who adopted it intended to vest such power in the Legislature would be to place the legislative branch of the government above the Constitution which created it, and to place power in the Legislature to annul and set aside the sovereign will of the people as expressed in their Constitution. We have been unable to find and our attention has not been called to any decision of any court which holds or intimates that it was the intention to vest in the Legislature such powers. Those cases which reach the conclusion that neither the Legislature nor the Constitution has made an appropriation do not bottom their decision upon the fact that the framers of the Constitution intended the placing of such power as we are here discussing in the Legislature, but upon the well-established principle that courts do not make laws, but simply interpret them, and that even though the Legislature or framers of the Constitution may have intended to provide an appropriation, the courts are helpless to remedy the situation unless the language employed is susceptible of the construction that an appropriation has been made.

The Constitution of this state having by the provisions quoted and referred to herein fixed the salaries of the Justices of this court, and provided that same cannot be changed during the term of office, and provided further that they **shall receive same,** does this language amount to an appropriation made "by law"? In the case of Menefee, State Treasurer, v. Askew, supra, Justice Williams, speaking for the court, es-

tablished the rule of this state that no particular language or appropriate form of expression need be used to constitute an appropriation, and that the language used by the Legislature in the act then being considered constituted an appropriation. It will, therefore, be helpful to refer to the exact language used by the Legislature in the act then under consideration. The court was considering section 3 of article 6, chapter 19, Laws 1909, which reads as follows:

"The State Game and Fish Warden shall receive an annual salary of eighteen hundred ($1,800) dollars, and his actual and necessary traveling expenses, not to exceed, however, the sum of eight hundred ($800) dollars a year, to be paid monthly upon the filing of his itemized statement of such expenses duly sworn to. Such salary and expenses to be paid out of the game protection fund. He shall also be reimbursed for his actual and necessary office expenses, including expenses of catching and shipping game for propagating purposes, to be paid monthly and in the same manner as his salary and traveling expenses."

It will be noted that no mention is made of an appropriation, no such language as "there is hereby appropriated" or phrase of like character is used. The act simply fixed the amount of the salary of the Warden, the manner of payment, and provided that he should receive same, and this court held that that language constituted an appropriation. Compare the language used in the legislative act then under consideration and that used in the Constitution and the Legislature in the applicable provisions cited herein and it will be found that they are almost identical. Certainly both provide the amount of compensation, the person to whom, payable, the manner of payment, and provide that the officer shall receive same. Bearing in mind the settled rule of construction that constitutional provisions should receive a broader and more liberal construction than applies to statutes, for the reason that in the first instance you are dealing with original and unlimited power, and in the next with limited and delegated power, we hold that the language used in the Constitution as herein set forth constitutes an appropriation to pay the salary of the petitioner in such sums and in such manner as the Legislature has provided. It has all the elements requisite to an appropriation. It fixed a sum certain, the amount payable at the time of his election, because same could not be changed during his tenure of office; to whom payable; the time of payment, this being fixed by' the Legislature in the exercise of a power granted; and in

payment of a specific object. We further hold that, this being an appropriation made by the people in the Constitution, it constitutes a continuing appropriation and that the limitation contained in section 55, article 5, of our Constitution is not applicable to appropriations made in the Constitution itself.

This view is in accord with the firmly established rules of construction, as is said by Judge Cooley:

"The object of construction, as applied to a written Constitution, is to give effect to the intent of the people in adopting it. But this intent is to be found in the instrument itself. It is therefore a very proper rule of construction, that the whole is to be examined with a view to arriving at the true intention of each part. The rule applicable here is, that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory." Cooley, Const. Lim. (7th Ed.) 89-91-92.

And in arriving at this conclusion, our way was lighted by article 4, Constitution of Oklahoma:

"Section 1. Legislative, Executive and Judicial. The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

We can reach no other conclusion than that the intent of the framers of our Constitution can only be carried into effect by the adopting of these conclusions.

We are not unmindful that the Legislature faced an unparalleled economic emergency, and it is asserted the exigencies of that emergency required temporary measures be taken which, although constitutionally questionable in normal times, should not be disturbed on account of overriding necessity. To that view we cannot subscribe. The Constitution guarantees to the petitioner the compensation fixed by law to his office at the time of his election, and by so doing guaranteed to the people of this state a judicial system that would be entirely independent of the other two branches of government, and if this cardinal constitutional guaranty must yield to so-called economic necessity, is

it less sacred than those provisions of our Constitution which guarantee to every accused the right of trial by jury, that justice shall be administered without denial, delay, or prejudice; that no person shall be deprived of life, liberty, or property without due process of law; that all persons shall have the inherent right to life, liberty, and the pursuit of happiness and the enjoyment of the gains of their own industry? We think not. Each makes certain the enjoyment of the rights therein guaranteed, and we are totally unable to distinguish between constitutional guaranties so as to give effect to some during emergencies and deny effect to others.

For the reasons stated, the writ is granted as prayed.

SWINDALL, Special C. J., and CULLISON and ANDREWS, JJ., and CHASE, BAILEY, and TRICE, Special JJ., concur. ROBINSON and CHESNUT, Special JJ., dissent.

RILEY, C. J., and McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., having certified their disqualifications in the case, the following were duly appointed and qualified as Special Justices: T. M. ROBINSON, W. A. CHASE, FRANK M. BAILEY, V. R. BIGGERS, W. R. CHESTNUT, and A. W. TRICE.

---

ANDREWS, J. (specially concurring). While I concur in the opinion of my associates, I do not agree with them that it was necessary to go to the length to which they went in expressing their views with reference to the issue in this case. As I view the record, there is but one issue involved, which is whether or not a constitutional officer shall be deprived of his salary fixed by law because the Legislature fails or refuses to make an appropriation therefor sufficient to pay that amount.

Section 2, art. 10, of the Constitution requires the Legislature to provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year. Under that provision, the amount of taxes is dependent on the expenses of the state. There is no constitutional limitation as to the amount of taxes that may be provided, except by inference that the amount of the taxes shall not exceed the amount necessary to pay the estimated ordinary expenses of the state. While section 9, art. 10, of the Constitution is a limitation on the rate of ad valorem taxation for state purposes, section 12, art. 10, of the Constitution authorizes the levying and collection of various other taxes.

We must, therefore, start with the premise that it is the duty of the Legislature to provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year. The salary of a Justice of the Supreme Court is a part of the ordinary expenses of the state for each fiscal year. The relator is a Justice of the Supreme Court, and his salary was fixed by law prior to his election to that office. Under the provisions of section 10, art. 23, of the Constitution, the salary to which he is entitled may not be changed after his election and during the term of office for which he was elected, for there was no law enacted prior to his election providing for such a change. However, it is contended in this case that the writ prayed for should not issue because the Legislature did not make an appropriation for the payment of his salary in an amount sufficient to pay the statutory amount thereof, and the entire defense is based on the provisions of section 55, art. 5, of the Constitution. The provisions of that section must be construed in connection with the provisions of other sections of the Constitution, included in which is section 12, art. 6, of the Constitution. Under those provisions, every bill passed by the Legislature making appropriations of money embracing distinct items shall, before it becomes a law, be presented to the Governor for his approval, and it is therein provided that any item or items thereof disapproved by the Governor shall be void unless repassed by a two-thirds vote according to the rules and regulations prescribed in section 11, art. 6, of the Constitution. When the sections are read together, it is apparent therefrom that if the Governor should disapprove any item of appropriation for the salary of a constitutional officer, or reduce any item thereof to an amount below the amount fixed by law for the salary of such an officer, and his judgment thereon should be supported by a vote of one-third of the members of either the Senate or the House of Representatives, a constitutional officer would be deprived of the salary to which he is entitled under the law and which the Constitution says may not be changed during his term of office, if the salary of a constitutional officer is dependent upon the periodical enactment of appropriation bills. To so hold would be to hold that the Constitution which provides

that the powers of the government shall be divided into three separate departments (section 1, art. 4) affords a plan by which the Chief Executive and one-third of the members of either the Senate or the House of Representatives may effectively destroy the judiciary department of the government, or require the judiciary to perform its services required by the state to be performed without that compensation to which it is entitled under the law and which the Constitution says shall not be changed during a term of office.

It is equally true that a majority of either the House of Representatives or the Senate might defeat the constitutional guaranty that the salary of the Governor may not be changed during his term of office, by refusing to make an appropriation for the payment thereof in the amount provided by law. I can give my consent to no such holding.

It seems to me that the people in adopting the Constitution intended thereby to provide a plan by which constitutional government should be established and continued without any provision by which either of the three departments of government might or could destroy either of the other departments or impede the operation thereof by failing or refusing to make appropriations in the proper amount for the payment of the salaries of constitutional officers which have been duly fixed by law. Especially is that rule applicable to the judicial department of the government, for by section 6, art. 2, of the Bill of Rights, the courts of justice of the state are required to be open to every person, that speedy and certain remedy may be afforded for every wrong and for every injury to person, property, or reputation. Certainly it was not intended that the judges of those courts should be deprived of their salaries because the Legislature failed or refused to make appropriations for the payment thereof.

As stated by Special Justice CHESNUT, the legislative act in question was an attempt to reduce salaries of six members of this court and the salaries of other officers in order to make the appropriations for the expenses of the state come within the expected or estimated income of the state. In so doing, section 2, art. 10, and section 10, art. 23, of the Constitution were violated. As heretofore stated, it is not the duty of the Legislature to make the appropriations come within the expected or estimated income of the state. It is its duty to provide sufficient taxes to defray the estimated or-

dinary expenses of the state, and the constitutional guaranty against the changing of the salaries of constitutional officers is as much a part of the Constitution as any other provision thereof.

I am fully conscious of the economic condition which is said to be the excuse of the Legislature for attempting to do things which the Constitution prohibits, but I cannot believe that an economic condition justifies the violation of the Constitution. That times are hard is no more excuse for the Legislature violating a constitutional provision by attempting to reduce the salaries of constitutional officers than good times would be an excuse for the Legislature violating the constitutional provision by attempting to increase such salaries. The constitutional provision is as applicable under the one economic condition as it would be under the other.

ROBINSON and CHESNUT, Special Justices (dissenting). We cannot concur in the interpretation of the constitutional provision announced in the majority opinion that the creation of an office thereunder, and providing for the fixing of the salary thereof by legislative enactment, constitutes an appropriational proprio vigore for the salary of such office and dispenses with the necessity of a legislative appropriation therefor.

When we consider our state Constitution in relation to the Legislature and its duties, and the sections of the Constitution relating to appropriations, and our own court decisions, it seems to us that it is clear that the framers of the Constitution intended for the Legislature to make levies to cover the expenses of the state government, and to make appropriations out of the funds so levied to meet the needs of the state for a period of two years.

Section 2, art. 10:

"The Legislature shall provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year."

Section 3, art. 10:

"Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for levying a tax for the ensuing fiscal year, which, with other resources, shall be sufficient to pay the deficiency as well as the estimated ordinary expenses of the state for the ensuing year."

Section 4, art. 10:

"For the purpose of paying the state

debt, if any, the Legislature shall provide for levying a tax, annually, sufficient to pay the annual interest and principal of such debt within 25 years from the final passage of the law creating the debt."

Section 33, art. 5:

"All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills. No revenue bill shall be passed during the five last days of the session."

Section 36, art. 5:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Section 55, art. 5:

"No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payment be made within two and one-half years after the passage of such **appropriation act,** and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

Subject to the limitations of the federal Constitution, the law-making powers of the people of the state are supreme, and in the exercise of that right there can be no question but what a provision could have been incorporated in our Constitution making a continuing appropriation for the salaries of officers provided for by the Constitution, or, for that matter, officers created by legislative enactment under the provision of the Constitution, and it is equally clear that the payment of salaries for officers provided by the Constitution could be left to the legislative enactment.

The majority opinion lays stress upon the words "appropriation by law," and points out that the phrase "by law" embraces constitutional provisions as well as legislative enactment, and with this conclusion we heartily agree.

This court so held in the case of Betts v. Commissioners of The Land Office, 27 Okla. 64, 110 P. 766. Justice Williams, in discussing the right of the Commissioners of the Land Office to pay the expense of the leasing department, said:

"The Legislature has not acted relative to the payment of the expenses of said leasing department, and until such time, under the controlling requirements of section 10 of the Enabling Act relative to this trust, such expenses are to be paid under the rules and regulations or laws existing at the time of the erection of the state, and section 55, art. 5, does not apply. The provisions of this act of March 4, 1894, provide that all the expenses and costs of the leasing of said lands shall be paid out of the rentals. There was no constitutional provision at that time providing that an appropriation should be effective only for a certain, definite time after its enactment, or that it must specify the sum certain. If it was a valid, continuing appropriation as it existed under the laws of the territory of Oklahoma, and if, by the terms of section 10 of the Enabling Act, it was brought over and kept in force in the state until the Legislature of the state prescribed rules and regulations, it is still a valid, continuing appropriation until the Legislature acts."

And again, in speaking with reference to the right of the Commission to invest and reinvest the school funds, said:

"Section 6 of article 11 of the Constitution constitutes a continuing appropriation of the common school fund and other educational funds for the purposes of investment and reinvestment. Said fund, when in the state treasury, may be paid out under the order of the Commissioners of the Land Office pursuant to rules and regulations made by the Legislature for the purposes of investment and reinvestment in accordance with section 6, art. 11, Const., without any specific appropriation under the requirements of section 55, art. 5, Const."

So we here have two specific instances of appropriation by constitutional provisions, but we do not think the fact that these specific appropriations are found in the Constitution lends any support to the construction placed by the majority opinion upon the constitutional provision that:

"No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

It seems to us that from the fact that the framers of the Constitution made special

provisions for the handling and disposition of the trust funds coming to the state for school purposes, but made no such provision for any other expenditures, and then enacted the general provision above referred to with reference to expenditure of all other state moneys, we should reasonably conclude that they intended to leave the expenditure of all other moneys in the hands of the Legislature to be disposed of by appropriation acts; and this seems to us to be the logical construction to be placed upon the provision itself.

The words "such appropriation act" in the constitutional provision must refer to the words "appropriation by law," and must mean the same thing, and therefore it seems to us the proper interpretation of this provision, reduced to its simplest form, would seem to be, "No money shall ever be paid out of the treasury of this state, except in pursuance of an appropriation act, nor unless such payments be made within two and one-half years after the passage of such appropriation act." And in this construction we are supported by the former decision of this court in the case of Menefee, State Treasurer, v. Askew, 25 Okla. 623, 107 P. 159, cited by majority opinion. Justice Williams, speaking for the court, said:

"Section 55, art. 5, of the Constitution provides: 'No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payment be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum.'

"The following authorities support the contention that, where a constitutional provision fixes salaries of officers with a limitation, same neither to be changed nor increased during the term to which such officer was appointed or elected, and a definite time being fixed by the Constitution or statute for the payment of such officer, such provisions proprio vigore constitute an appropriation out of the treasury for the payment thereof as the same becomes due. Thomas v. Owens, 4 Md. 189; State v. Hickman, 9 Mont. 370, 23 P. 740, 8 L. R. A. 403; State v. Kenney, 10 Mont. 485, 26 P. 197; State v. Weston, 4 Neb. 216; State v. Weston, 6 Neb. 16; State v. Burdick, 4 Wyo. 272, 33 P. 125, 24 L. R. A. 266; People v. Goodykoontz, 22 Colo. 507, 45 P. 414. And

some authorities go to the extent that such is the effect when the office is created by statute, and the salary and time of payment also fixed thereby. Reynolds v. Taylor, 43 Ala. 420; Nichols v. Comptroller, 4 Stew. & P. (Ala.) 154; Carr v. State, 127 Ind. 204, 26 N. E. 778, 11 L. R. A. 370, 22 Am. St. Rep. 624. The foregoing rule is criticized and not followed in the case of Myers v. English, 9 Cal. 341; Pickle v. Finley, Comptroller, 91 Tex. 484, 44 S. W. 480; Shattuck v. Kincaid, 31 Or. 379, 49 P. 758; Kingsbury v. Anderson, 5 Idaho, 771, 51 P. 744."

"In the case of Pickle v. Finley, Comptroller, supra, Mr. Chief Justice Gaines, in speaking for the Supreme Court of Texas, said:

"'Leaving out of view the provision in our Constitution which limits all appropriations to two years, the case of Reynolds v. Taylor, 43 Ala. 420, sustains the position taken by counsel. The Revised Code of Alabama (section 675) provided that a marshal of the Supreme Court should be appointed by the judges of the court, and that 'the annual salary of such marshal is two thousand dollars.' Another section of the Revised Code (section 210) declares that "the salaries of all officers are payable on the last day of each month." It was held that these provisions were an appropriation to pay the salary. We do not concur in this proposition. The only case cited in its support is that of Nichols v. Comptroller, 4 Stew. & P. (Ala.) 154, in which the law which fixed the salary in question was couched in very different language. The words were: "A salary of $1,749, to be paid quarterly out of any money not otherwise appropriated." The phrase "not otherwise appropriated" means not appropriated to any other purpose than here is appropriated, and clearly implies an intent to make a present appropriation. But we cannot agree that the mere fixing of the salary of an officer implies a purpose to appropriate ipso facto the money for its payment. Neither do we think that a provision in a general code, directing the periods at which the salaries of officers "shall be payable," manifests any such intent. The evident purpose of such a provision is merely to fix the time when the salary may be paid, after the appropriation for its payment has been made. Thomas v. Owens, 4 Md. 189, is a leading case upon the same line. The Constitution of Maryland provides that no money should be paid out of the treasury except upon an appropriation made by law, created the office of Comptroller, and also provided that he should receive a salary of $2,500, which should not be diminished during his term of office. The words seem to have been "shall receive"—the same which are employed in the section of our Revised Statutes now under consideration. It was held

that this was an appropriation. But it seems to us that the purpose was to name and fix the amount of the salary merely, and not to authorize its payment without a legislative appropriation. In the case of State v. Hickman, 9 Mont. 370, 23 P. 740 (8 L. R. A. 403), the court followed this decision, and placed the same construction upon similar provisions in the Constitution of Montana. In the case of State v. Kenney, 10 Mont. 485, 26 P. 197, the same ruling was applied to a legislative enactment, but in that case the statute not only fixed the salary of the Code commissioner, the relator in the suit, but also made it the duty of the Comptroller, upon approval of the work of the commissioners, to draw his warrant for the salaries of the commissioners under the act. A direction that the Comptroller shall draw his warrant in favor of a claimant for a certain sum, it would seem, is an appropriation. Such, again, was the case of State v. Bordelon, 6 La. Ann. 68. There the statute directed that the Treasurer should "pay" the sum in question "upon the warrant of the Auditor of Public Accounts out of any moneys in the treasury not otherwise appropriated." In the case of State v. Weston, 4 Neb. 216, the Constitution of Nebraska (art. 16, sec. 25) provided that "the Auditor shall draw the warrants of the state quarterly for the payment of the salaries of all officers under this Constitution whose compensation is not otherwise provided for, which shall be paid out of any funds not otherwise appropriated." This was held to be an appropriation. That Constitution also provided that no money should be paid out of the treasury except upon an appropriation made by law, but did not contain the further limitation that no appropriation should extend beyond two years. In the other cases cited in behalf of the relator which bear upon the point under consideration. the statutes construed contained words which not only fixed the obligation of the state to pay, but also others from which it could be reasonably inferred that the Legislature not only intended to fix the obligation, but also to provide for its payment by making an immediate appropriation'."

And further on in the opinion the court uses this language:

"'The salary of no officer or employee of the state, or any subdivision thereof, shall be increased in such bill, nor shall any appropriation be made therein for any such officer or employee, unless his employment and the amount of his salary, shall have been already provided for by law'—it is clearly shown that a continuing appropriation is not permissible under our Constitution. In none of the authorities that we have been able to find, where a continuing appropriation was permitted, were such sections as 55 and 56, art. 5, supra, contained at that time. See, also, People ex rel.

Richardson v. Spruance, 8 Colo. 530, 9 P. 628; In re Continuing Appropriations, 18 Colo. 195, 32 P. 272. The result is that such appropriation is effective only for 2½ years after the passage of said act by the Legislature."

So, to hold that the creation of an office and the fixing of the salary thereof does in itself constitute appropriation for the payment of such salary without more, we must overrule the former holding of this court in the Menefee Case, and not only must we overrule the former holding of this court, but we must overturn the construction placed on the above constitutional provision by the officers and courts in the discharge of their duty in the administration of the affairs of this state since statehood. It has been the custom in this state, since the enactment of the above constitutional provision, for the Legislature to make appropriations for the payment of all officers and salaries, and to this date this method has been universally pursued, and has been universally adopted and practiced by all of the courts and officials of this state.

We think the rule announced by this court in the Menefee Case is supported by the better reasoning and by the weight of authority. The Supreme Court of Oregon, in the case of Shattuck v. Kincaid, 49 P. 758, said:

"It is difficult to understand, however, upon what principle an enactment of the nature indicated can have the effect claimed for it. The plain letter of the statute falls very far short of an express direction to that end, and the apparent object to be attained is fully accomplished when the salary and times of its payment are definitely fixed. No other or further intendment is predicated of statutes of like nature where individuals only are concerned, and a different rule ought not to prevail because the state is concerned. But we believe the weight of authority is opposed to this latter advance upon the doctrine, and that the better rule requires something more by which to indicate a legislative intendment to effectuate an appropriation. In Nichols v. Comptroller, 4 Stew. & P. 154, the case upon which Reynolds v. Taylor, supra, seems to have been based, it was determined 'that an act fixing a salary, 'payable quarter yearly out of any money in the treasury not otherwise appropriated' made an appropriation for the purpose of meeting the quarterly payments. In Humbert v. Dunn, 84 Cal. 57, 24 P. 111, the act under consideration provided that 'each member (of a commission) shall receive a salary of two thousand four hundred dollars payable monthly, * * * to be paid out of any money in the treasury not otherwise appropriated,'

282

and it was held that this operated as an appropriation. The statutory provisions, as indicated by these cases, are similar to the Nebraska constitutional provision above referred to. And in Cutting v. Taylor (S. D.) 51 N. W. 949, which comes nearer the case at bar, the language employed was: 'The auditor * * * shall issue and deliver to the claimant in each city, town, etc., his warrant upon the territorial treasury for an amount equal to two per cent. of the premiums received upon the policies issued upon any property in any such city, town, etc., and such warrant shall be paid by the territorial treasurer upon presentation thereof.' See, also, State v. Kenney, 10 Mont. 485, 26 P. 197. From statutes of the nature indicated by these authorities the inference is natural and legitimate that it was the legislative intent not only that the amount and times of payment of the salaries should be rendered definite and certain, but that, when falling due, funds in the treasury applicable to their payment should be at all times in readiness for their prompt discharge, and hence the appropriation as a necessary result to meet the purposes of the legislation. It is one thing to fix the amount and times of payment of an officer's salary, and quite another to provide funds, and make them available at specified times, so that the state will not at any time default in its payments, and it does not occur to us that a fixed salary with stated times for the payment of proportional installments thereof can, with any greater propriety, carry with it an appropriation of funds with which to meet the payments than where the state has become otherwise obligated under authority of law, and no appropriation has been made anticipating payment. Whatever may be the correct rule, where the salary is fixed by the Constitution, or where it is by that instrument rendered unchangeable during incumbency, followed by legislation simply fixing the amount and times of payment thereof, it is quite certain that, if regard be paid to the known and well-settled rules of statutory construction, the Legislature has not, by the enactment of such a statute, without else, manifested an intention of setting aside funds in the treasury for its payment. Something more is needed, some setting aside of particular fund, or designation of a fund, out of which it shall be paid, or direction to the officer in charge requiring him to make payment at particular times, or that it be paid out of the treasury."

And this interpretation is supported by these further decisions: Myers v. English, 9 Cal. 341; Pickle v. Finley, 91 Tex. 484, 44 S. W. 480; Kingsberry v. Anderson, 5 Idaho, 771, 51 P. 744.

And even if this court had not already adopted this construction of the constitutional provision under consideration, we would feel impelled to follow this construction for the reason that it is the construction that has been adopted since statehood.

This court, in the case of Leininger et al. v. Ward-Beekman & Brooks, 139 Okla. 292, 282 P. 467, stated:

"The rule of departmental construction was announced by the territorial court in Hoffman v. County Commissioners, 3 Okla. 325, 41 P. 566, to be as follows: 'In the construction of a doubtful and ambiguous law, the contemporaneous construction of those who are called upon to act under the law, and where appointed to carry its provisions into effect, is entitled to very great respect.' And it has been followed in Foot v. Town of Watonga, 37 Okla. 43, 130 P. 597, 598, in the following language: 'The construction placed on statutes or constitutional provisions by officers in the discharge of their duties, either at or near the time of the enactment, which has been long acquiesced in, is a just medium for their judicial interpretation.' Which was cited with approval in Glasco v. State Election Board, 121 Okla. 119, 248 P. 642. See, also, Crosbie v. Partridge, 85 Okla. 196, 205 P. 758."

We desire to point out in the case of Nichols v. Comptroller, 4 Stew. & P. 154, cited in the majority opinion, that the act construed fixing the salary provided that the same should be "payable quarter yearly out of any money in the treasury not otherwise appropriated," but in our Constitution no similar language is employed.

The Alabama Constitution does not have the provision found in ours limiting to two and one-half years payment made after the passage of the appropriation act, and therefore, our Constitution could not be said to be copied from the Alabama Constitution, and it occurs to us that it would be just as logical to say that if the framers of our Constitution did have in mind the construction placed upon the Alabama Constitution by its courts, they sought to avoid the effect thereof by placing in our Constitution this provision against continuing appropriations.

We refuse to become alarmed about the independence of the judiciary. In a government where the will of the people is not supreme, the independence of the judiciary would certainly be vital in the protection of the rights of the people, but in a government such as ours, where the government itself is simply the will of the people expressed through its officers, agents, and servants, who are selected by the people themselves, we are impelled to the conclusion that the independence of the judiciary is

not fraught with the meaning or importance that it was in the days of kings and crowns, when the people themselves did not make and execute the laws, either directly or through their chosen representatives. The framers of the Constitution only gave members of this court a limited tenure in office and were not afraid to leave the fixing of the salaries of the judiciary in the hands of the Legislature, and it appeals to us that the right to fix the salary of the judiciary is certainly as great a power over the judiciary as the right to make appropriations to meet that salary. We cannot help but believe that if the framers of the Constitution had felt that giving the Legislature the right to make appropriations to meet the salaries of judicial officers would make a dependent judiciary, they would have been equally as apprehensive that the giving to the Legislature the right to fix the salaries would have done so. The argument that the Legislature could destroy the judiciary by refusing to make any appropriation certainly can have no greater force than the argument that giving the Legislature the right to fix the salary of the judiciary gave the Legislature the power to destroy it, and yet the framers of our Constitution expressly gave to the Legislature this latter right, and we, therefore, conclude that the framers of our Constitution were not afraid to give to the Legislature the supreme power in the matter of appropriation. In passing we desire to note that section 10, art. 23, of the Constitution applies to all officers alike, whether legislative, executive or judicial, and has no peculiar application to the judiciary of this state.

As was said by the court in the case of Myers v. English, 9 Cal. 341, supra:

"It is very true that the Legislature possesses the power to stop the whole machinery of government, whenever it is willing to take the responsibility of doing so. That body might repeal all the existing laws, and leave the people of the state practically without government for a time. So the Legislature, under the Constitution of this state, at one session, can fix the compensation of members at the succeeding session; and this compensation, though merely nominal, cannot be increased by the incoming Legislature. The Legislature has the power to repeal all existing revenue laws, and thus leave the state treasury without funds. The Legislature has also the power of taxation to the extent of the value of all the property in the state.

"But with all due reference to the learned and distinguished jurist who decided the case of Thomas v. Owens, we are compelled to arrive at a different conclusion. We think the

power to collect and appropriate the revenue of the state is one peculiarly within the discretion of the Legislature. It is a very delicate and responsible trust, and if not used properly by the Legislature at one session, the people will be certain to send to the next more discreet and faithful servants.

"It is within the legitimate power of the judiciary, to declare the action of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the courts have no means, and no power, to avoid the effects of nonaction. The Legislature being the creative element in the system, its action cannot be quickened by the other departments. Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confided by the Constitution to the the body possessing the power of taxation. There may arise exigencies, in the progress of human affairs, when the first moneys in the treasury would be required for more pressing emergencies, and when it would be absolutely necessary to delay the ordinary appropriations for salaries. We must trust to the good faith and integrity of all the departments. Power must be placed somewhere, and confidence reposed in some one."

We, therefore, reach the conclusion that it was the intention of the framers of our Constitution that the judiciary, as well as all other officers, should be paid by appropriation through legislative acts. We do not think, however, that an interpretation of this provision of the Constitution is necessary to a determination of this case. The Legislature did appropriate $6,000 for the payment of petitioner's salary, and this amount it undertook to divide into twelve equal payments and to pay the petitioner only $500 per month. We think this provision which undertakes to restrict the amount that should be paid to the respondent monthly is unconstitutional and void. The petitioner's salary is fixed at $7,500 per annum, payable monthly, which would amount to $625 per month, and since the Legislature could neither increase nor decrease petitioner's salary during his term of office, they certainly could not provide for a lesser payment per month than was actually due him, although they might fail to appropriate a sufficient amount to take care of his salary for the entire year, and this court might grant the petitioner the writ of mandamus upon this ground, but to do so would permit the petitioner to exhaust the appropriation which was made for him in about nine and one-half months of the year and leave no appropriation to take care of the salary for the remaining months.

But, even though a clear legal right may be shown, the court may in the exercise of

its discretion refuse to grant the writ, and we feel that in view of the economic conditions existing at this time and with the knowledge that the Legislature in its effort to meet these conditions reduced the appropriation for all state officers alike, and that in doing so the Legislature was simply mindful of the fact that thousands of citizens were out of employment; that people were unable to pay their taxes; that the sources of income to the state had been greatly reduced and impoverished, and that thousands of the citizens of this state were losing their property because of the burdens of taxation, and while confronted with this impoverished condition of the citizens to pay taxes, the Legislature was compelled to add unusual burdens to take care of the unemployed of this state and to help relieve distress and want, and in view of all these demands upon the state treasury the Legislature felt there would be no undue hardship or burden upon the officers of this state to make appropriations for only a portion of their salary, and believing that the future Legislature will make a provision for taking care of the balance of the salary of this petitioner, as well as the other officers involved, we feel that this court ought to exercise its equitable prerogative to refuse to grant the petitioner the writ as applied for in this case.

In reaching this conclusion, we desire to say, if there were any evidence here that the action of the Legislature could be construed, in any way, as being unfriendly toward the judiciary of this state, we would be impelled to a different conclusion, but, since all of the officers of the state, including the judiciary, were treated exactly alike, we can find nothing upon which to base the conclusion that the Legislature was in any way unfriendly toward the judiciary of this state.

### On Petition for Rehearing.

TRICE, Special J. The Attorney General in his petition for rehearing on behalf of respondents urges that the former decision of the court is erroneous in six particulars.

Under the first assignment, he argues that the Constitution does not make an appropriation for the salaries of Justices of the Supreme Court for the reason that the fund out of which the salaries are to be paid is not designated, and cites in support the case of Menefee, State Treasurer, v. Askew, 25 Okla. 623, 107 P. 159. The Supreme Court of this state in the case of Miller v. Childers, 107 Okla. 57, 238 P. 204, held as follows:

(Syllabus 3): "An act of the Legislature making an appropriation of state funds which is otherwise valid is not rendered void by the mere failure to recite therein the particular fund from which said moneys shall be paid, for, in such event, the contrary not appearing in the act itself by express terms or by implication, such moneys are payable out of the general fund of the state, unless payment from such fund is prohibited by the Constitution of the state."

Passing upon the necessity for the designation of a fund, in the body of the opinion the court said:

"The matter has not heretofore been expressly determined by this court, and is of so great public concern that we feel the question should, nevertheless, be determined here.

"Said section 55 of article 5, supra, requires an appropriation bill to meet five requirements, as follows, to wit: (a) Make an appropriation of money; (b) provide for its payment within 30 months; (c) specify the sum appropriated; (d) state the object to which said sum shall be applied; and (e) not require reference to any other law to fix the sum appropriated.

"Plaintiff in error cites, without quoting from the following decisions of this court, to wit: Menefee v. Askew, 25 Okla. 623, 107 P. 159, 27 L. R. A. (N. S.) 537; Meyer v. Clift, 31 Okla. 793, 113 P. 1042. Like counsel for plaintiff in error, we fail to find any expression therein upon the point under consideration and need not analyze the rules of law therein announced.

"In 36 Cyc. page 892, paragraph C, the author collects authorities on the point, and says that: 'Nor need the statute designate the fund out of which the money is drawn.' "

The court then cites in support of the rule announced cases from California, Colorado, and Nevada. Authorities are also collected in 59 C. J., page 245, note 43 (a), to the effect that it is not necessary in the absence of a constitutional provision that an appropriation act should name the fund from which the appropriation is payable.

At the time of the framing of the Constitution there was, of course, no fund or funds in existence, and the convention could not designate an existing fund out of which these salaries were to be paid. However, by section 45, article 5, of the Constitution:

"The Legislature shall pass such laws as are necessary for carrying into effect the provisions of this Constitution"

—and section 2, article 10:

"The Legislature shall provide by law for an annual tax sufficient, with other

resources, to defray the estimated ordinary expenses of the state for each fiscal year" —the convention did require the Legislature by positive command to raise the money necessary to meet these charges.

Respondents in their second proposition assert that there is no sound distinction between an office created by the Legislature at its option under the express authority of the Constitution and an office created at the option of the Legislature without such express constitutional authority, that is to say, no distinction can be made between the provisions of sections 15 and 16, art. 25 (Schedule), of the Constitution and section 17 of that article. This contention of the respondents is denied in the case of Bohart v. Anderson, 24 Okla. 82, 103 P. 742. In that case the court said:

"Section 15 of the Schedule provides for the compensation of the Governor, etc. * * * Section 16 provides that, until changed by the Legislature, the salary of the Justices of the Supreme Court of the state shall be $4,000 per annum. It will thus be observed that salaries and compensation of all of the state officers are provided for in the Constitution, with the exception of the Clerk of the Supreme Court, members of the Board of Agriculture, and Bank Commissioner. It is to be noted that section 17, in effect, provides that such state officers as may be created, and all clerks and assistants (such officers, including the clerks and assistants, except the secretary of the Corporation Commission, would have to be created in the future or subsequent to that time), shall receive such compensation for their services as may be provided by law; and, of course, as such officers, clerks, and assistants, except the secretary of the Corporation Commission, had neither been created nor provided for, the term 'as may be provided by law' in that case would not only literally, but also from the context, inevitably mean in the future, or contemplate future action by the Legislature." (Emphasis ours.)

In that case the court further said with respect to the constitutional provision:

"These enactments, expressing the solemn purpose of the people of the territory. * * * were before the constitutional convention when it met. Hence it placed the compensation for the Clerk of the Supreme Court separate and apart from all of the balance of the judicial officials of the state government, providing, as we have seen, that he should receive such compensation as may be provided by law."

The distinction between these classes of offices is clearly and soundly made in that case, and we deem it a sufficient answer to respondents' second contention.

Respondents' third contention is but a restatement of their second proposition in a different form and is without greater merit.

Respondents in their fourth proposition contend that the decision is contrary to Menefee v. Askew, supra. The holding in this case was thoroughly analyzed in the original opinion filed herein, and respondents have advanced no new reasons to cause us to recede from our construction of the Menefee Case.

Under the fifth proposition respondents argue that section 56, article 5, of the Constitution contemplates the Legislature should provide in a general appropriation bill for the salaries of all officers of the state, and say this provision is meaningless if the establishment of an office and the fixing of the salary constitutes a continuing appropriation. The case of Menefee v. Askew, supra, urged by respondents upon other points, decides this identical question contrary to the contention advanced here. In that case it was held that an act creating an office, fixing the salary and providing for its payment, constituted an appropriation, the continuation of which was limited only by the two and one-half year provision in section 55, article 5, of the Constitution. The offices of Justices of the Supreme Court were created by the Constitution, section 3, article 7; their salaries were fixed by section 16, article 25 (Schedule), with authority given the Legislature to change the amount only, and with that authority limited by section 10, article 23. The same is an annual appropriation by operation of law. The Constitution requires by mandatory terms the payment of the salaries so fixed. Section 15, article 25, reads:

"Until otherwise provided by law, the officers of the state shall receive annually as compensation. * * *"

And section 16 reads:

"The salary of the Justices of the Supreme Court shall be four thousand dollars per annum, each. * * * until changed by the Legislature." (Emphasis ours.)

On examination of the whole instrument it is clear that the constitutional convention intended that Justices of the Supreme Court should be paid a salary out of the state treasury and that such salary should be $4,000 per annum, each, until changed in amount by the Legislature. It is difficult to imagine more explicit language by which the convention might have expressed that intention. We have held in the original opinion that the constitutional time limit on appropriations does not apply to

appropriations made by the Constitution itself. It is not reasonable that the convention, having commanded the payment of certain salaries to the Justices of the Supreme Court, should have limited the life of that command to two and one-half years. The rule that constitutional appropriations are not limited by the two and one-half year provision in section 55, article 5, in no way prevents the application of that limitation to legislative appropriations. The provision remains an effective barrier against the expenditure of legislative appropriations after the expiration of the time limit.

Respondents under their sixth proposition assert the provisions of the Constitution for an independent judiciary are applicable also to the executive and legislative branches of government. With this contention we have no quarrel, and the failure, if any, of the Legislature to make adequate appropriations for those departments is not now before this court for decision. With reference to the Criminal Court of Appeals, that court was not created by the Constitution but by legislative act under a special authority given in section 2, article 7. We are not passing upon the salary of any state officer except Justices of the Supreme Court. The court as now constituted is organized and has jurisdiction to determine that issue only. It is suggested by respondents that, because the Constitution vests authority in the Legislature to alter the number of Justices of the Supreme Court and to change the amounts of their salaries, the position of the Justices is not materially different from that of officers created by legislative act alone. The power of the Legislature in this connection is not plenary but limited. Under guise of an alteration in number, the Legislature cannot work the practical abolition of the court, nor can it reach the same result by the diminution of the salaries to nominal amounts. The Constitution contemplates the continuous existence of the court and the adequate compensation of its members as an independent and essential department of the state government and the authority given the Legislature in this connection is subservient to the main purposes of the Constitution.

The several arguments advanced by respondents consist largely in selecting particular phrases of the Constitution and attempting to give those phrases effect without regard to the remainder of the instrument or the express intent of the convention in adopting it. As pointed out in the opinion of the court, that method of construction of constitutions is neither the approved nor proper one. Bohart v. Anderson, supra.

The brief of W. A. Ledbetter, as amicus curiae, for a rehearing presents the proposition that Justices SWINDALL, CULLISON, and ANDREWS are disqualified to sit in this case. The theory advanced for such disqualification is that, in the event the court had decided petitioner was entitled to receive a salary of $625 per month notwithstanding the legislative appropriation, and should have further decided that such salary was payable out of the appropriation made by the Legislature, then the fund created by that appropriation would by such payments be exhausted prior to expiration of the fiscal year and the Justices named above precluded from receiving their salaries out of that fund unless the Governor should issue deficiency certificates or the Legislature in a special session make a further appropriation.

"The interest which disqualifies a judge is a direct pecuniary interest or a direct property interest, or one which involves some individual right or privilege in the subject-matter of the litigation **whereby a liability or pecuniary gain must occur on the event of the suit.**" 33 C. J. 992. (Emphasis ours.)

"The interest must be a direct, real, and certain interest in the subject-matter of the litigation; not merely indirect, or incidental, or remote, 'or contingent, or possible." 33 C. J. 994.

The amicus curiae relies, among others, upon the case of Tumey v. Ohio, 273 U. S. 510, 71 L. Ed. 749, of which the late Chief Justice Taft was the author. The diligence of the amicus curiae must have also discovered the later case of Chief Justice Taft entitled Dugan v. Ohio, 277 U. S. 61, 72 L. Ed. 784, the headnote of which reads as follows:

"A mayor of a city having a commission form of government in which his duties are merely judicial, and who receives a stated salary, is not disqualified to decide prosecutions for violation of the liquor laws in the municipality, although his salary is paid out of the fund to which the fines imposed by him contribute."

In the latter case the Chief Justice distinguishes between the rule in the Tumey Case, where the compensation of the judge was largely dependent upon fines imposed by him and in fact consisted of a certain part of those fines, and one where the officer's salary was fixed in amount. Other cases hold to the same effect.

"And where the salary of a judge is pay-

able out of a fund arising from the imposition of fines, as is the case with the judges of some of the city courts in this state, his interest is too remote to disqualify him to sit in a cause which may involve the imposition of a fine to be thus appropriated. Re Guerrero, 69 Cal. 88." Ex parte Alabama State Bar Association, 92 Ala. 113, 8 So. 768, 12 L. R. A. 134.

The interest which disqualifies a judge has been defined as follows:

"It must be such a cause that a judgment rendered therein would necessarily and directly and substantially affect his personal rights." City of Oakland v. Oakland Water Front Co. (Cal.) 50 P. 268.

The appropriation attempted to be made by the Legislature is as follows:

Supreme Court

Justices (9 at $6,000)     $54,000.00

The right of the Justices named to receive their statutory salaries of $6,000 per annum is in no way involved in this action. Whatever decision is entered herein can in no way affect that right. The right of these Justices to be paid out of the state treasury the stated salaries provided for their offices by law can neither be diminished nor increased by the event of this action regardless of the effect of that judgment upon the fund provided for such payment. The ground proposed for their disqualifications rests upon the assumption that, out of several eventual decisions in this case, one certain judgment might have been rendered, that the effect of such a possible judgment, if rendered, would be to diminish the fund out of which those Justices' salaries would then be payable, if the executive and legislative departments thereafter failed to replenish that fund. Under Mr. Ledbetter's theory, members of the Supreme Court would be disqualified to pass upon the validity of an act of the Legislature to raise revenue for state purposes for the reason that their salaries would be payable out of the fund so raised. Such a view is wholly untenable. If it be conceded that the result contended for by the amicus curiae is possible, it is too clear to permit of dispute that it is also indirect, incidental, remote, and contingent.

"The liability of pecuniary account or relief to the judge must occur upon the event of the suit and not result remotely, in the future from the general operation of law upon the status fixed by the decision." 12 Am. & Eng. Encyc. Law, 45.

In matters indirectly involving the diminution of their own salaries, the highest authority has held that the judges are not disqualified. In the case of Evans v. Gore, 253 U. S. 245, 64 L. Ed. 887, the Supreme Court of the United States, in passing upon the constitutionality of an act of Congress subjecting the salaries of federal judges to an income tax, held that, although the decision would, in effect, determine whether or not the Justices of that court would be required to pay the tax, the jurisdiction of the cause would not be declined or renounced and the court would proceed to hear and determine the controversy, saying that that conclusion was supported by precedents reaching back many years. The courts of last resort of other states have similarly refused to disqualify themselves in such cases. State ex rel. Wickham v. Nygaard, 159 Wis. 396, 150 N. W. 513, Ann. Cas. 1917A, 1065; Long v. Watts (N. C.) 110 S. E. 765, 22 A. L. R. 277. Certainly, such matters involving a diminution of compensation of the Justices, and not by way of possibilities or contingencies, present much stronger and more persuasive grounds for disqualification than the theory of the petitioner. It does not seem possible that these cases and the rule there announced have escaped the search of the learned attorney appearing amicus curiae. This matter may be concluded with a quotation from the opinion of Mr. Justice Van Devanter in the case of Brooker v. Fidelity Trust Co., 263 U. S. 413, 68 L. Ed. 362:

"A further matter calls for brief notice. The bill charges that the judgment of affirmance by the Supreme Court of the state is void because one of the judges participating therein had an interest in the case which worked his disqualification. The case related to the duties and obligations of a corporation holding property under a conventional trust. The facts set forth to show the disqualification are as follows: Three or four years theretofore a citizen of the state had executed a will wherein he designated the judge as one of the executors and trustees under the will. The testator died about the time the case was submitted to the court and the will was admitted to probate a day or two before or after the judgment of affirmance. The judge became an executor and trustee under the designation in the will. When the will was executed, and up to the time of his death, the testator owned many shares of stock in corporations holding property under trusts like that in question. The stock was to pass and did pass to the executors and trustees for administration and disposal under the will. The judge's relation or prospective relation to that estate and to the stocks belonging to it is the sole basis of the charge that he had a disqualifying interest in the case. We think the facts set forth and relied upon neither support nor tend to sup-

port the charge; and we experience difficulty in reconciling its presence in the bill with the care and good faith which should attend the preparation of such a pleading."

There appear no causes for recusation true in fact or sufficient in law, and the Justices named should not withdraw.

" 'A judge ought not to withdraw upon a mere suggestion unless the cause of recusation is true in fact and **sufficient in law**; because the office of judge is one necessary for the administration of justice, and from which a judge **should not be permitted to withdraw without sufficient grounds.'** (Emphasis ours.)" Conkling v. Crosby, (Ariz.) 239 P. 511.

The suggestion of the amicus curiae of the disqualification of Justices SWINDALL, CULLISON, and ANDREWS is without merit.

The petition of respondents for a rehearing is denied.

SWINDALL, Special Chief Justice, BIGGERS, Special Vice Chief Justice, CULLISON and ANDREWS, Justices, and CHASE and BAILEY, Special Justices, concur.

ROBINSON and CHESNUT, Special Justices, concur in that portion of the supplemental opinion holding that Justices CULLISON, SWINDALL, and ANDREWS are not disqualified to participate in said cause, and dissent from that portion of said opinion holding that there is a constitutional appropriation to pay salaries of Justices of the Supreme Court.